(No. 64838.—)

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIAM FRANKLIN, Appellant.

*Opinion filed January 24, 1990.—Rehearing denied April 9, 1990.*

80

82

84

86

Daniel M. Kirwan, Deputy Defender, and Michelle A. Zalisko, Assistant Defender, of the Office of the State Appellate Defender, of Mount Vernon, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Cecil A. Partee, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Inge Fryklund and Maureen A. Harton, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE MORAN delivered the opinion of the court:

The defendant, William Franklin, was charged by information in Cook County for the murder (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(a)(1), (a)(2)) of Elgin Evans, Jr.

A jury found the defendant guilty of murder. The State requested a hearing to determine whether the death penalty should be imposed. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d).) The same jury found the defendant eligible for the death penalty and found there were no mitigating factors sufficient to preclude a sentence of death. The death sentence was stayed (107 Ill. 2d R. 609(a)) pending direct review by this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

The defendant raises the following issues pertaining to the guilt phase of his trial: (1) whether he was denied his right to a trial by an impartial jury because the State used police records, which were unavailable to him, in challenging for cause four members of the venire; (2) whether the circuit court abused its discretion in certain evidentiary rulings; (3) whether he was denied his right to a fair trial as a result of prosecutorial comments during closing arguments; (4) whether the circuit court erred in not instructing the jury on accomplice witness testimony; (5) whether the circuit court abused its discretion in denying the jury's request to review testimonial transcripts; and (6) whether he was denied his right to a fair trial as a result of the cumulative effect of the trial errors.

The defendant raises the following issues pertaining to the sentencing phase of his trial: (1) whether the requirement under section 9—1(b)(3) of the Criminal Code of 1961 that a defendant be found guilty of two or more murders includes the murder or murders in the case for which he is being sentenced; (2) whether section 9—1(b)(3) violates the State and Federal prohibitions against *ex post facto* laws where the prior murder conviction occurred before the statute became effective; (3) whether he was denied his right to a fair sentencing hearing as a result of prosecutorial comments during closing arguments at the first stage of the hearing; (4)

whether the circuit court abused its discretion in admitting photographs into evidence at the second stage of the hearing; (5) whether he was denied his right to a fair sentencing hearing as a result of prosecutorial comments during closing arguments at the second stage of the hearing; (6) whether the circuit court erred in instructing the jury that "neither sympathy nor prejudice shall influence you"; (7) whether the circuit court erred in not instructing the jury on the alternative mandatory sentence of natural life imprisonment; (8) whether the circuit court erred in informing the jury, after the instructions, to "unanimously [agree] upon which verdict form to return"; and (9) whether the defendant was denied his right to effective assistance of counsel. The defendant also challenges the constitutionality of the Illinois death penalty statute.

The following evidence was adduced at the guilt phase of the defendant's trial. The body of Elgin Evans, Jr., was discovered in the vicinity of the Ford Motor Company plant in Chicago Heights, Illinois, on February 6, 1980. Dr. Tae An, the pathologist assigned to the case, testified that Evans was shot once in the right side of his head and once in the left side of his chest, and that the cause of his death was multiple gunshot wounds.

Mose Evans, the victim's grandfather, testified that at approximately 8 a.m. on February 6, 1980, he saw his grandson enter a dirty grey or blue four-door automobile near the intersection of 16th and Hanover Streets in Chicago Heights. He testified that he recognized the defendant in the neighborhood three or four times prior to February 6, 1980. Evans stated that on January 27, 1982, two police officers questioned him and showed him an array of photographs from which he identified the defendant as the driver of the car. On cross-examination, Evans admitted that he had seen the driver for "[n]o

more than a second." Evans emphasized that he saw the front of the driver's face, but at a preliminary hearing he testified that he saw only the back of the driver's head and the side of his face.

Ulric "Buddy" Williams testified that at approximately 9 a.m. on February 6, 1980, a man named Marion Holmes called and asked him to "jump" his car. Williams went to Holmes' residence and worked on the car. A short while later the defendant arrived in a grey, four-door Ford LTD. Williams identified the defendant as the driver of the car. The defendant got out of the car, informed Williams that Elgin Evans was in the passenger's seat, and went inside to speak with Holmes.

Williams stated that the defendant and Holmes returned a few minutes later and told him that they were going to "take a ride" in the defendant's car. Williams drove, Holmes sat in the passenger's seat and the defendant and Evans sat in the back seat. Williams testified that he had never met Evans, but approximately one week earlier he, the defendant and Holmes looked for Evans, because Evans allegedly set up a robbery of a gambling operation. Williams testified that Evans was under the impression that the defendant was going to supply him with cocaine to sell. Williams further testified that both he and Evans thought that the purpose of the trip was to find a place to dispose of stolen auto parts.

Williams testified that Holmes directed him to an area near the Ford Motor Company plant in Chicago Heights. Holmes then told Williams, "We don't need you for this," and the defendant told Evans, "Elgin, give us a hand with this." Williams stated that he still was under the impression that they were disposing of stolen auto parts, and that he was acting as a lookout. He stated that the defendant, Holmes and Evans exited and went to the trunk of the car. Williams testified that in the rearview mirror he saw the defendant pull a "small

pistol" from his jacket and shoot Evans in the head; he then saw the defendant bend over Evans and heard another gunshot.

Williams stated that the defendant and Holmes returned to the car and Holmes told him where to drive. As they were driving, the defendant wiped off the pistol and threw it into the "Calumet Sag Channel." Williams drove to the defendant's house, then to Holmes' house, and he did not see either one of them afterwards.

In November 1981, Williams was taken into custody in Lake County, Indiana. Williams learned that Holmes was also in custody at the same facility and heard that Holmes planned to kill him. Williams then told the authorities of the Evans murder. Williams spoke with Agents James Collier and Tom Pritchett of the Illinois Department of Law Enforcement on five or six occasions between November 1981 and January 1982.

Williams agreed to plead guilty to an armed robbery charge, to testify truthfully against the defendant in the instant case, and to testify truthfully against Holmes in two cases. In return, the State agreed to recommend a six-year sentence on the armed robbery plea and to arrange to have Williams' family relocated. After serving three years' imprisonment on the armed robbery sentence, Williams was paroled and relocated with his family.

Williams testified that the State made no promises of leniency with respect to Evans' murder. He stated that he was charged for that murder, but after a preliminary hearing the circuit court found that there was no probable cause to charge him for that offense.

Williams testified that he had three prior felony convictions: in July 1980, he pled guilty to possession of a stolen motor vehicle and was sentenced to two years' probation; in August 1980, he was convicted of possession of a controlled substance and was sentenced to 18

months' imprisonment; and in June 1981, he was convicted of mail fraud, fined and placed on work release.

Agent James Collier of the Illinois Department of Law Enforcement testified that he and Agent Tom Pritchett met with Williams on several occasions between November 1981 and January 1982. Collier also testified that he conducted a photo lineup at Mose Evans' home in January 1982, and Evans identified the defendant as the driver of the car that his grandson entered in February 1980.

The defense rested without presenting any evidence. A jury found the defendant guilty of the murder of Elgin Evans, Jr. Following the conviction, the State requested a hearing to determine whether the death penalty should be imposed. After the first stage of the sentencing hearing, the same jury found that the defendant was at least 18 years of age at the time of the offense (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)), and that there was one statutory aggravating factor in existence rendering the defendant eligible for the death penalty (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3) (the defendant was convicted of murdering two or more individuals)).

At the second stage of the sentencing hearing, the State presented the following evidence in aggravation. In December 1982, the defendant was convicted and sentenced to a term of 100 to 300 years' imprisonment for the 1976 murder of James Roland. Terrence Burns, an assistant State's Attorney involved in that case, recounted the evidence adduced at the trial. Seven color photographs of Roland were also introduced into evidence.

The State presented additional evidence in aggravation. In June 1965, the defendant pled guilty to possession of a narcotic drug and was sentenced to three years' probation. In October 1965, the defendant pled guilty to bank robbery and was sentenced to 15 years'

imprisonment, but was released after serving five years' imprisonment. Finally, the evidence adduced during the guilt phase of the defendant's trial was introduced into evidence by way of stipulation.

The defendant presented the following evidence in mitigation. Seven of his children testified that the defendant has been a positive influence in their lives. All seven had completed high school, several had attended college, and all seven were employed.

After considering all of the evidence in aggravation and mitigation, the jury found that there were no mitigating factors sufficient to preclude the imposition of the death penalty.

## THE TRIAL

At the outset, we address the defendant's motion that was taken with the case and seeks to allow his appellate counsel to review the statement of Ulric Williams. Through discovery, defense counsel asked the State to produce the statement. The State responded that certain portions of the statement included the names of government informants and asked the circuit court to excise these portions pursuant to Supreme Court Rule 412(j)(ii) (107 Ill. 2d R. 412(j)(ii)). The circuit court conducted an *in camera* inspection of the statement in the presence of the court reporter and assistant State's Attorney, but the circuit court did not allow defense counsel to be present. The circuit court then excised the relevant portions of the statement, with instructions that the entire statement be made available if the cause was appealed.

The State tendered the excised version of the statement to the defendant. The defendant now seeks to have his appellate counsel review the entire statement to determine if there are any meritorious issues regarding the excised portions of the statement. Although the defend-

ant did not include the statement in the record on appeal, he indicated that it is presently before this court in People v. Holmes, Docket No. 65409.

Because the parties did not brief this issue, we will not rule on the propriety of the circuit court's decision to exclude defense counsel from the *in camera* inspection. We have reviewed the statement, however, and conclude that the excised material is privileged in that it contains the names of government informants. (107 Ill. 2d R. 412(j)(ii).) Any potential error pertaining to the *in camera* inspection was therefore harmless beyond a reasonable doubt. Accordingly, the defendant's motion is denied.

The defendant first asserts that he was denied his right to a trial by an impartial jury because the State used police records, which were unavailable to him, in challenging for cause four members of the venire. The four—Philip Scott, Jaime Wilson, Miles Beckham and Felton Smith—had answered *voir dire* questions about their own criminal histories. The State examined the "rap sheets" of the venirepersons, notified the circuit court that these four misrepresented their criminal records, and on that basis asked the court to excuse them for cause. The circuit court granted the State's request. Defense counsel did not object to the contents of the "rap sheets" or the fact that the venirepersons were excused for misrepresenting their criminal pasts, but did object to the procedures utilized by the State in challenging these venirepersons.

The defendant maintains that the State had a duty to tender the police records to defendant's counsel and its failure to do so denied him his right to an impartial jury. The State argues that it was under no duty to tender the records.

In *Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97, the Supreme

Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." This court codified the *Brady* holding in Supreme Court Rule 412(c) (107 Ill. 2d R. 412(c)). Here, the police records did not qualify as evidence under *Brady*, because they did not contain any information that was either favorable or unfavorable to the defendant; the records merely contained information relating to the criminal histories of the venirepersons. The State used the police records to verify the truthfulness of the venirepersons. Under these circumstances, *Brady* does not mandate the production of the police records. See *Terrell v. United States* (D.C. 1976), 361 A.2d 207; *Britton v. United States* (D.C. 1975), 350 A.2d 734; *State v. Jackson* (La. 1984), 450 So. 2d 621.

Furthermore, the State's failure to tender the police records did not deny the defendant his right to an impartial jury. The contents of the records established that four members of the venire failed to state the truth during *voir dire*. A venireperson's lack of veracity in no way promotes the administration of justice and cannot be deemed beneficial to the accused's or the State's case in chief. While the accused has the right to full *voir dire* examination of prospective jurors (107 Ill. 2d R. 234), the manner and scope of the examination are left to the discretion of the circuit court (*People v. Porter* (1986), 111 Ill. 2d 386, 401). In response to the defendant's objection to the State's use of the police records, the circuit court observed, "[T]he sole function of this Court is to try to find 12 impartial jurors who will live up to their oaths as jurors." One important purpose of the *voir dire* examination is to test the competency and impartiality of prospective jurors. The State's use of police records helped to ensure that both the defendant and the State

would receive a trial by a fair and impartial jury, as the jury did not ultimately include four venirepersons who demonstrated a lack of truthfulness and veracity.

The defendant next asserts that the circuit court erred in certain evidentiary rulings. Evidentiary rulings lie within the discretion of the circuit court and will not be disturbed on review absent an abuse of that discretion. (*People v. Boclair* (1989), 129 Ill. 2d 458, 476.) Similarly, rulings involving the scope of cross-examination lie within the discretion of the circuit court and, absent an abuse of discretion resulting in manifest prejudice to the defendant, will not be reversed on appeal. 129 Ill. 2d at 477-78.

The defendant initially contends that the circuit court erred in not permitting him to ask Mose Evans, during cross-examination, about the speed at which he had been driving when he identified the defendant. However, the question originally put to Evans about the speed of the car was a compound one. Hence, the circuit court properly sustained the State's objection. (See, *e.g., People v. Rossini* (1962), 25 Ill. 2d 617, 621 (questions must be asked in their proper form).) Defense counsel made no attempt to rephrase the objectionable question. As a result, the defendant cannot now argue that the circuit court precluded him from inquiring into the speed at which Evans had been driving.

The defendant also contends that the circuit court erred in not permitting him to impeach Mose Evans, during recross-examination, with his failure to inform the police that he had seen the defendant on three or four occasions prior to February 6, 1980. The record reveals, however, that during cross-examination defense counsel read portions of Evans' testimony at the preliminary hearing into evidence and questioned him about that testimony. The jury was therefore aware of possible inconsistencies in the testimony. Furthermore, defense

counsel's question to Evans was outside the scope of the redirect examination.

As a general rule cross-examination is limited to the scope of the direct examination. (*People v. Matthews* (1959), 18 Ill. 2d 164, 173.) Circumstances, however, may be developed on cross-examination that lie " 'within the knowledge of the witness which explain, qualify, discredit or destroy his direct testimony,' " even though that material may not have been raised on direct examination. (*People v. Williams* (1977), 66 Ill. 2d 478, 486, quoting S. Gard, Illinois Evidence Manual R. 471 (1963).) Recross-examination, in contrast, is limited to responding to the testimony brought out on redirect examination. (*People v. Kline* (1982), 92 Ill. 2d 490, 503. See also R. Ruebner, Illinois Criminal Trial Evidence ch. 4, at 97 (1986); M. Graham, Cleary & Graham's Handbook of Illinois Evidence §611.12, at 395-97 (4th ed. 1984).) Here, the defendant was free on cross-examination to impeach Evans with his failure to inform the police that he had previously seen the defendant. Therefore, the circuit court did not abuse its discretion in limiting recross-examination to the scope of the redirect examination.

The defendant also contends that the circuit court erred in allowing Ulric Williams to testify, during direct examination, about the no-probable-cause determination at his preliminary hearing. The defendant argues that because a no-probable-cause determination does not bar the State from seeking a later indictment (Ill. Rev. Stat. 1985, ch. 38, par. 112—4), the testimony erroneously led the jury to believe that Williams was a credible witness and had no motive to lie. The State argues that Williams' testimony was proper and the jury was free to draw any reasonable inference with respect to that testimony.

The circuit court overruled the defendant's objection to the State's question concerning the results of the

probable-cause hearing. It was not error to admit into evidence the results of the probable-cause hearing, and the State was under no duty to inform the jury that a no-probable-cause determination does not bar a later indictment. The defendant was free to explore that possibility on cross-examination, bring that information into evidence through other sources, or argue that point during closing arguments. Accordingly, the circuit court did not abuse its discretion in allowing Williams to testify about the results of the probable-cause hearing.

Finally, the defendant contends that the circuit court erred in not allowing him to question Williams, during cross-examination, about his knowledge of the law of perjury. Williams testified that the authorities never threatened him with prosecution if he refused to testify against the defendant. Defense counsel attempted to impeach Williams on this point:

"[DEFENSE COUNSEL]: At the preliminary hearing, were you asked the following question and did you give the following answer:

'Q. Did the police threaten to charge you with this occurrence, Mr. Williams?

A. Yes.

Q. And was that before or after you had discussed what you say you saw on February 6, 1980 with them.

A. Before and after.'

Did you make those answers and were those questions put to you?

[WILLIAMS]: Yes.

* * *

[DEFENSE COUNSEL]: Now do you know what perjury is?

[WILLIAMS]: Yes, I do.

[DEFENSE COUNSEL]: And do you know that you can be—tell us what it is.

[STATE'S ATTORNEY]: Objection.

THE COURT: Sustained. Stricken.

[DEFENSE COUNSEL]: You know you could be prosecuted for perjury if you were to tell a different story now—

[STATE'S ATTORNEY]: Objection.

THE COURT: We will have a sidebar right now. [Outside the presence and hearing of the jury.] Your purported question is a statement that is so totally inaccurate that it doesn't even smack of being the law. You start to ask this man, 'Do you know that if your story is different you can be prosecuted for perjury.' Do you really mean that?

[DEFENSE COUNSEL]: No, I didn't mean it.

* * *

THE COURT: All right. Ladies and gentlemen of the jury I'm convinced it was just an inadvertent statement in [defense counsel's] last question that the State objected to. I have sustained that objection and it dealt with the term 'differently.' Just because a witness testifies differently one time or another does not necessarily mean that's perjury at all. So just disregard, if you will, that last comment. You may proceed, sir."

During another sidebar, the following exchange took place:

"THE COURT: Excuse me. In that vein let's get something straight again. I tried to communicate this to you. You can't start talking about you testified differently. One, that's a conclusion. That's for [the jury] to determine. You know the proper foundation to ask and you know how to do it. I don't want to hear anymore about he testified differently then or he testified differently today or whatever. You lay it out and you let those people on the jury determine whether he testified differently, and in your argument you can argue that you believe the evidence shows that he testified differently, but not in these questions. Do we understand?

[DEFENSE COUNSEL]: Yes."

It cannot be concluded that the defendant was precluded from cross-examining Williams about his knowledge of the law of perjury. Williams testified that he

knew the meaning of perjury. The circuit court then sustained the State's objection to defense counsel's question, which asserted that because the witness testified "differently" he could be prosecuted for perjury. The circuit court sustained the objection on form and foundational grounds. Similarly, testifying "differently" does not necessarily translate into inconsistent, contradictory, or perjurious testimony. See *People v. Ricker* (1970), 45 Ill. 2d 562.

The defendant next asserts that he was denied his right to a fair trial as a result of improper prosecutorial remarks during closing arguments. The defendant first assigns error to the State's characterization of him as an "executioner" and "professional hit man." Although the State referred to the defendant in this manner on at least nine separate occasions during both closing and rebuttal arguments, the defendant objected only once; the circuit court sustained the objection and instructed the jury to disregard the comment. It is well settled that the circuit court can correct an error by sustaining a timely objection and instructing the jury to disregard the comment. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 178.) The defendant's failure to object to the remaining comments resulted in a waiver of this issue through procedural default. *People v. Gacho* (1988), 122 Ill. 2d 221, 239.

Even if the defendant had objected to these remarks, the State's characterization of defendant as an "executioner" and "professional hit man" was not error. Prosecutorial comments based on facts in evidence or reasonable inferences drawn therefrom fall within the bounds of proper argument (*People v. Johnson* (1986), 114 Ill. 2d 170, 198), and prosecutorial comments that are invited and not prejudicial do not constitute error (*People v. Christiansen* (1987), 116 Ill. 2d 96, 125). Here, the comments made during closing arguments were based on

facts in evidence, and the comments made during rebuttal arguments were invited. During the cross-examination of Williams, defense counsel asked whether the murder he witnessed was a "hit," and Williams responded affirmatively. During closing arguments, defense counsel stated:

. "And by all indications, particularly, the location of the bullets, one in the head and the other through the heart, and the small caliber of the gun used, this has the appearance of an assassination and a hit.

The State has taken great pains to point that out. I agree with them."

Under these circumstances, the State's characterization of the defendant was neither prejudicial nor error.

Having concluded that the State's characterization of the defendant was not error during the guilt phase of the trial compels us to disagree with the defendant's assertion that the State's similar characterizations of him during closing arguments at the sentencing phase constituted error. The comments were either based on facts in evidence or reasonable inferences drawn therefrom.

The defendant also assigns error to three remarks which, according to him, were intended to direct the jury's attention to his failure to testify. The defendant failed to object to these remarks; therefore, he waived this issue through procedural default. (*Gacho*, 122 Ill. 2d at 239.) Even if the defendant had preserved this issue for review, the State's remarks were not error. The test to determine whether a defendant's right to remain silent has been violated is whether the remarks were intended or calculated to direct the jury's attention to his silence. (*People v. Morgan* (1986), 112 Ill. 2d 111, 133.) Here, the three remarks were not intended to draw the jury's attention to the defendant's failure to testify.

The first comment, "No one in this room can disprove the intentions of whether [the defendant] pumped

one into the head and a second one into the heart," was made during the State's closing arguments and was based on facts in evidence. Considering the remark in context, it is apparent that the State intended to demonstrate to the jury that it had fulfilled its burden to prove that the defendant possessed the requisite intent to commit the offense. The second and third comments were made during rebuttal arguments and were in direct response to points raised in the defendant's closing arguments. The second comment, "Well, you didn't hear any evidence that [Williams] shot him from that stand. That establishes that anybody [sic] put a gun in Buddy Williams' hands," was in response to defense counsel's hypothetical to the jury: "How do any of you, and how can you even or ever [know that] Buddy Williams didn't do the whole thing himself? Think about that. All we have is his word for it." The final comment, "I submit to you that I have not heard any impeachment of any inconsistent testimony when Buddy Williams was on that stand," was in response to defense counsel's attack on Williams' credibility. Under these circumstances, the State's remarks did not constitute error.

The defendant next asserts that the circuit court erred in not instructing the jury on accomplice witness testimony. The defendant alleges that because of Williams' involvement in the commission of the offense, the circuit court should have offered Illinois Pattern Jury Instruction, Criminal, No. 3.17, which provides:

"When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." (Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981) (IPI Criminal 2d).)

The defendant, however, never tendered this instruction. The party who desires a specific instruction bears the burden of tendering it to the court. (*People v. Neal* (1985), 111 Ill. 2d 180, 201.) The court is only required to offer an instruction *sua sponte* if it relates to the elements of the offense, the presumption of innocence or the burden of proof. (*People v. Turner* (1989), 128 Ill. 2d 540, 562-63.) Accordingly, the circuit court did not err in not instructing the jury on accomplice witness testimony.

Nevertheless, the defendant argues that because Williams' involvement in the commission of the offense was evident and because Williams'· testimony was crucial to the State's case, his counsel's failure to tender the instruction constituted ineffective assistance of counsel. In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the Supreme Court set forth the standard for judging the effectiveness of counsel's performance. The defendant bears the burden to prove that his "counsel's representation fell below an objective standard of reasonableness" and but for the "unprofessional errors, the result of the proceeding would have been different." (*Strickland*, 466 U.S. at 687-88, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068; *People v. Albanese* (1984), 104 Ill. 2d 504, 526.) Specifically, the defendant must show "that his counsel made errors so serious, and his performance was so deficient, that he was not functioning as the 'counsel' guaranteed the defendant by the sixth amendment to the United States Constitution, and *** that these deficiencies so prejudiced the defendant as to deprive him of a fair trial, a trial whose result is reliable." (*People v. Caballero* (1989), 126 Ill. 2d 248, 259-60.) In judging counsel's performance, the court must look to the totality of the circumstances. *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

Considering the totality of the circumstances, it cannot be said that defense counsel's performance was deficient for failing to tender the accomplice witness instruction. An accomplice is one who could have been indicted for the offense either as a principal or an accessory. (*People v. Hrdlicka* (1931), 344 Ill. 211, 221-22.) After Williams came forward and offered his account of what had transpired, the State charged him with the murder of Elgin Evans, Jr. After a preliminary hearing, the circuit court found that there was no probable cause to charge Williams for that offense. Although a finding of no probable cause at a preliminary hearing does not serve as a bar to later indictment (Ill. Rev. Stat. 1985, ch. 38, par. 112—4), the fact that there was a no-probable-cause finding suggests to the reasonably competent counsel that the witness did not act as an accomplice. As the standard is one of objective reasonableness under "prevailing professional norms" (*Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065), defense counsel's reliance on the no-probable-cause finding in deciding not to tender the accomplice witness instruction cannot be deemed deficient.

The defendant next asserts that the circuit court abused its discretion in denying the jury's request to review testimonial transcripts. During its deliberations, the jury sent a note to the trial judge requesting copies of certain transcripts. The trial judge contacted defense counsel and the State's Attorney, and they agreed to send a note to the jury inquiring as to which portions of the transcripts it wished to review. The jury responded that it wanted to see specific portions of the transcripts of Mose Evans' testimony. After discussing this matter at length with defense counsel and the State's Attorney, the trial judge sent the following note to the jury: "You will not be furnished with the transcript of the testimony

you requested. You must rely on your collective memory of the testimony you heard."

The decision to furnish the jury with testimonial transcripts rests within the sound discretion of the circuit court. (*People v. Pierce* (1974), 56 Ill. 2d 361, 364.) Absent an abuse of that discretion, the circuit court's decision will not be disturbed on review. (*People v. Olinger* (1986), 112 Ill. 2d 324, 349.) Here, the circuit court noted that it would have been required to excise portions of the testimony to accommodate the jury's request, and the court feared this would only serve to confuse the jury and highlight sections of the testimony that should not necessarily have been highlighted. The circuit court also noted that the testimony was still fresh in the jurors' minds, as they heard it the previous day. Accordingly, the circuit court did not abuse its discretion in denying the jury's request.

The defendant next asserts that he was denied his right to a fair trial as a result of the cumulative effect of the trial errors. Having concluded, however, that none of the points relied upon by the defendant constituted error, logic dictates that there cannot be cumulative error.

## THE SENTENCE

The defendant next asserts that section 9—1(b)(3) of the Criminal Code (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)), which requires a defendant to have been "convicted of murdering two or more individuals" in order to be eligible for the death penalty, does not include the murder or murders in the case for which he is being sentenced. The heart of the defendant's argument concerns the meaning of the term "convicted," which, according to him, encompasses a finding of guilt *and* a sentence. (See *People v. Lashmett* (1984), 126 Ill. App. 3d 340.) At the first phase of the defendant's sentencing hearing, the defendant, by the mere order of the proceedings,

was not yet sentenced; therefore, he argues that although he was found guilty of the murder of Elgin Evans, Jr., he was not yet convicted. Because the defendant only had one prior murder conviction, he argues that he was not eligible for the death sentence under section 9—1(b)(3).

The resolution of this question turns on the meaning of the term "convicted." Section 5—1—5 of the Unified Code of Corrections sets forth the definition of the term "conviction":

> " 'Conviction' means a judgment of conviction *or* sentence entered upon a plea of guilty or upon a verdict or finding of guilty of an offense, rendered by a legally constituted jury or by a court of competent jurisdiction authorized to try the case without a jury." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—1—5.)

A "judgment of conviction" and a "sentence" are separate and distinct, because, according to the principles of statutory construction, material to either side of the disjunctive "or" must be viewed separately. (*People v. Vraniak* (1955), 5 Ill. 2d 384, 389.) The term "sentence" means the "disposition imposed by the court on a *convicted* defendant." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—1—19.) This definition requires that a person be convicted of an offense before he can be sentenced. It follows, therefore, that a "judgment of conviction" is the circuit court's entry of judgment on a verdict of guilty. (See *People v. Foster* (1987), 119 Ill. 2d 69, 78; *People v. Owens* (1984), 102 Ill. 2d 88, 113; but see *People v. Kuhn* (1988), 126 Ill. 2d 202 (judgment is not *final* without a sentence).) For the purpose of section 9—1(b)(3), a defendant is "convicted" once the circuit court enters judgment on the verdict of guilty. Accordingly, a defendant is eligible for the death penalty under section 9—1(b)(3) if: (1) he has been found guilty of two or more murders in the case for which he is being

sentenced; or (2) he has been found guilty of one murder in the case for which he is being sentenced and has at least one other murder conviction. The defendant was therefore eligible for the death penalty under section 9—1(b)(3).

The defendant next asserts that section 9—1(b)(3) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)) violates the State and Federal prohibitions against *ex post facto* laws, as applied to him, because the murder of which he was previously convicted occurred prior to the statute's effective date. The defendant was previously convicted of the May 1976 murder of James Roland, but the statute did not become effective until June 1977. The defendant therefore alleges that the State was precluded from using this conviction as a statutory aggravating factor.

A law is *ex post facto* if it is both retroactive and disadvantageous to the defendant. (*People v. Felella* (1989), 131 Ill. 2d 525, 536.) A law disadvantages the defendant if it criminalizes an act that was innocent when done, increases the punishment for a previously committed offense or alters the legal rules of evidence by making conviction easier. (*People v. Anderson* (1973), 53 Ill. 2d 437, 441.) The purpose of the prohibition against *ex post facto* laws is to provide persons with fair warning of the conduct which gives rise to criminal penalties, the degree of punishment and the legal rules of evidence. *People v. Shumpert* (1989), 126 Ill. 2d 344, 352.

Section 9—1(b)(3) neither creates a new or independent criminal offense nor increases the punishment for the previously committed offense. The section merely dictates when an individual, who has been found guilty of murder under section 9—1(a), may be·eligible to receive the death penalty as a result of a previous murder conviction. The punishment is for the new crime, not the prior crime, and the penalty is enhanced only because the individual was found guilty of more than one murder.

A statute that increases the punishment for a subsequent offense is not an *ex post facto* law merely because the earlier conviction occurred prior to the statute's effective date. *People v. Coleman* (1986), 111 Ill. 2d 87, 93; *People ex rel. Carey v. Chrastka* (1980), 83 Ill. 2d 67, 77; *People v. Turner* (1947), 396 Ill. 221, 223.

Here, when the defendant committed the 1980 murder, he had fair warning that he would be eligible to receive the death penalty under section 9—1(b)(3) if two events were to take place: a guilty verdict for the 1976 murder and a guilty verdict for the 1980 murder. The defendant was subsequently found guilty of both offenses. Accordingly, the State's use of the defendant's earlier murder conviction as a statutory aggravating factor did not violate the State and Federal prohibitions against *ex post facto* laws.

The defendant next asserts that he was denied his right to a fair sentencing hearing as a result of the following colloquy which took place during closing arguments at the first stage of the hearing:

> "[DEFENSE COUNSEL]: The only point of departure, the only thing where I disagree with [the assistant State's Attorney] is quite frankly that you will not be able to satisfy yourself beyond a reasonable doubt that the previous murder about which [the assistant State's Attorney] talked about was a premeditated murder.
>
> There is nothing in the record to indicate whether [the judge], who sat on that case himself without a jury, decided that question. He entered a finding of guilty of murder. But it doesn't indicate in the record and you'll be able to see it for yourself whether he found him guilty as to the first count or whether he found him guilty of the second count.
>
> [ASSISTANT STATE'S ATTORNEY]: *Judge, I object. All murders are premeditated.*

THE COURT: I want to give you the most latitude. But that is a misstatement of the law. I sustain your objection ***. You may continue, sir." (Emphasis added.)

All murders are not premeditated (*People v. Davis* (1983), 95 Ill. 2d 1, 33-35); therefore, the circuit court erred in sustaining the objection. The error, however, did not prejudice the defendant.

Defense counsel's argument focused on the defendant's mental state in his prior murder conviction. In the prior murder, the defendant was charged under sections 9—1(a)(1) and (a)(2), which provided:

"(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another ***." (Ill. Rev. Stat. 1975, ch. 38, pars. 9—1(a)(1), (a)(2).)

It is unclear, however, whether the defendant's conviction was predicated under section 9—1(a)(1) or section 9—1(a)(2). During closing arguments, defense counsel attempted to show that the defendant would not have been eligible for the death penalty under section 9—1(b)(3) if he was convicted under section 9—1(a)(2). This argument was incorrect, because the defendant was eligible for the death penalty under section 9—1(b)(3) regardless of whether he was convicted under section 9—1(a)(1) or section 9—1(a)(2). (*Davis*, 95 Ill. 2d at 36 (defendant is eligible for the death penalty under section 9—1(b)(3) if he was convicted of two or more murders resulting from intentional or knowing acts).) Accordingly, the error was harmless beyond a reasonable doubt.

The defendant next asserts that the circuit court abused its discretion in admitting seven color photographs into evidence at the second stage of the sentencing hearing. Three of the photographs depicted the body of the victim of the 1976 murder at the murder scene, two depicted his face, one depicted his chest and one depicted his back. The defendant argues that the photographs were prejudicial, because they served no purpose but to inflame the passion of the jury. The State argues that the photographs were relevant to show the aggravated nature of the offense.

The defendant failed to object to the admission of these photographs into evidence; therefore, he waived this issue through procedural default. (*People v. Gacho* (1988), 122 Ill. 2d 221, 239.) Even if the defendant had preserved this issue for review, the photographs were admissible. The standard for determining the admissibility of evidence at the second stage of the sentencing hearing is whether the evidence is relevant and reliable (*People v. Brisbon* (1989), 129 Ill. 2d 200, 218), and that determination lies within the sound discretion of the circuit court (129 Ill. 2d at 223).

The seven photographs were probative of the violent nature of the criminal act and were corroborative of the trial testimony. Photographic evidence of this type is generally admissible for these purposes at the second stage of the sentencing hearing (*People v. Kubat* (1983), 94 Ill. 2d 437, 494-95; but see *People v. Brisbon* (1985), 106 Ill. 2d 342 (admission of photographs of victims for similar purposes during first stage of sentencing hearing is irrelevant and inadmissible)). Of course, prejudice to the defendant may result if the photographs are gruesome, and such prejudice must be weighed against the photographs' probative value. (*People v. Foster* (1979), 76 Ill. 2d 365, 378.) Here, while it may not have been necessary to admit all seven photographs into evidence,

it cannot be said that the admission of each was an abuse of discretion.

The defendant next asserts that he was denied his right to a fair sentencing hearing as a result of improper prosecutorial remarks during closing arguments. The defendant failed to object to any of these remarks; therefore, he waived this issue through procedural default. (*People v. Gacho* (1988), 122 Ill. 2d 221, 239.) Even if the defendant had objected, none of the remarks constituted error.

The defendant first argues that the State diminished the jury's sense of responsibility by suggesting that a verdict imposing the death penalty was a "recommendation" rather than a final judgment. In support thereof, the defendant relies on *Caldwell v. Mississippi* (1985), 472 U.S. 320, 330, 86 L. Ed. 2d 231, 240, 105 S. Ct. 2633, 2640 (prosecutor's argument that the State supreme court rather than the jury was the final arbiter constituted reversible error because it minimized the jury's sense of responsibility), and *People v. Yates* (1983), 98 Ill. 2d 502, 535-39 (prosecutor's argument that he would shoulder responsibility for defendant's sentence constituted reversible error). These cases are inapposite, because the State's comments neither diminished the jury's sense of responsibility nor shifted that responsibility to the circuit court. (*Cf. People v. Lego* (1987), 116 Ill. 2d 323, 349-50.) At the close of the rebuttal arguments, the State asked the jury "to impose the death penalty." After closing arguments, the circuit court instructed the jury that if it unanimously determined that there were no mitigating factors sufficient to preclude a sentence of death, "the court *must* sentence the defendant to death." (Emphasis added.) The State's comments during rebuttal arguments coupled with the jury instruction highlighted the jury's sense of responsibility in reaching a verdict.

The defendant also assigns error to the State's characterization of his closing arguments as "shocking," "insulting," "bunk," and "abominable." Although it is error for the State to criticize defense counsel (*People v. Monroe* (1977), 66 Ill. 2d 317, 323), it is proper to comment on the illogical nature of defense counsel's argument (*People v. Owens* (1984), 102 Ill. 2d 88, 106). During closing arguments, defense counsel attempted to equate the imposition of the death penalty with the defendant's conduct in murdering two individuals. During rebuttal arguments, the State emphasized that the two could not be compared, because the legislature passed the death penalty and its constitutionality has been upheld. While it may not have been necessary for the State to use the words "shocking," "insulting," "bunk," and "abominable," it is evident that the State did so in response to the tenor of defense counsel's argument. As a result, it cannot be said that the defendant was prejudiced by these remarks.

The defendant also argues that the State improperly criticized his mitigating evidence. The defendant presented the testimony of seven of his children to show the positive impact he has had on their lives. During rebuttal arguments, the State commented, "That's not mitigation. *** [T]hey said what you would expect children to say." An attorney is allowed considerable leeway during closing and rebuttal arguments. (*People v. Morgan* (1986), 112 Ill. 2d 111, 131.) Here, the State acknowledged that the defendant's seven children led productive lives. The State did not argue that this evidence was false or unreliable; it merely emphasized the bias of the children's testimony.

The defendant next asserts that the circuit court erred in instructing the jury that "[n]either sympathy nor prejudice should influence you." (IPI Criminal 2d No. 1.01(5).) It is well settled that this instruction is

proper. (*People v. Young* (1989), 128 Ill. 2d 1, 58; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 43; *People v. Johnson* (1987), 119 Ill. 2d 119, 150; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445.) Nevertheless, the defendant argues that this instruction was improper, as applied to him, because he presented the testimony of seven of his children with the purpose of appealing to the sympathy of the jury. This assertion is without merit, because the jury was instructed that it could consider "any facts or circumstances that provide reasons for imposing less than the most severe sentence." The jury was free to consider the defendant's relationship with his seven children and the positive influence he has had on their lives as a reason for imposing a sentence less than the death penalty, and the "sympathy" instruction in no way diminished the impact of this mitigating evidence. See *People v. Lego* (1987), 116 Ill. 2d 323, 350; *People v. Stewart* (1984), 104 Ill. 2d 463, 494.

The defendant next asserts that the circuit court erred in not instructing the jury on the alternative mandatory sentence of natural life imprisonment. This court recently held:

> "An instruction in the case of multiple murders should state that if the jury finds mitigating factors sufficient to preclude imposition of the death penalty, the defendant will be sentenced to natural life imprisonment, and no person serving a term of natural life imprisonment can be paroled or released, except through executive clemency." (*People v. Gacho* (1988), 122 Ill. 2d 221, 262.)

However, the new rule announced in *Gacho* was held to be prospective only. (*Gacho*, 122 Ill. 2d at 263; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 43-44.) At the defendant's sentencing hearing, which took place before our decision in *Gacho*, the circuit court properly instructed the jury in accordance with existing law. See *People v. Stewart*

(1984), 105 Ill. 2d 22, 71; *People v. Albanese* (1984), 102 Ill. 2d 54, 81.

The defendant argues that in light of *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708, the new rule announced in *Gacho* must be applied retroactively. *Griffith* held that decisions announcing new constitutional rules of criminal procedure are "to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." (479 U.S. at 328, 93 L. Ed. 2d at 661, 107 S. Ct. at 716.) *Griffith* is not applicable, because the right to a jury instruction on the alternative mandatory sentence of natural life imprisonment is a statutory, not a constitutional, right. *People v. Coleman* (1989), 129 Ill. 2d 321, 349.

The defendant next asserts that the circuit court erred in making the following statement to the jury prior to its deliberations:

> "After you have *unanimously* agreed upon which verdict form to return, the foreperson will sign the top line of the proper verdict form decided upon and the rest of you will affix your signatures below.
>
> Kindly advise the deputy that you have *unanimously* reached a verdict and you will be brought back into the courtroom to report your verdict." (Emphasis added.)

The defendant alleges that this was a misstatement of the law, because the jury must agree to the death penalty unanimously before the court can impose it, but if a single juror opposes the death penalty, the court can only sentence the defendant to a term of imprisonment. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(g).) As a result of this statement, the defendant alleges that he was denied his right to a fair sentencing hearing.

The defendant failed to object; therefore, he waived this issue through procedural default. (*People v. Gacho* (1988), 122 Ill. 2d 221, 239.) Even if the defendant had

preserved this issue for review, the statement, when considered in context, did not constitute error.

At the beginning of the second stage of the sentencing hearing, the circuit court instructed the jury properly regarding unanimity. At the close of the sentencing hearing, the circuit court offered the following instruction:

"If, after all of your deliberations, you unanimously determine that there is no mitigating factor or factors sufficient to keep the death sentence from being imposed, sign the verdict form which states that there is no mitigating factor or factors sufficient to preclude the imposition of the death sentence on the defendant. If you sign this form, the court must sentence the defendant to death.

If, after your deliberations, you are not unanimous in concluding that there is no mitigating factor or factors sufficient to preclude imposition of the death sentence, sign the form of verdict so indicating. If you sign this form, the court will sentence the defendant to imprisonment." (See IPI Criminal 2d No. 7A.15.)

The circuit court then informed the jury of the two possible verdict forms:

"We, the jury, having found beyond a reasonable doubt that the defendant had attained the age of 18 or more at the time that he committed the offense of murder, and having found beyond a reasonable doubt the existence of a statutory aggravating factor, have considered aggravating and mitigating factors relating to the imposition of the death penalty in this case.

*We unanimously conclude that there is no mitigating factor or factors sufficient to preclude the imposition of the death sentence upon the defendant William Franklin and that the court shall sentence the defendant to death.*

* * *

We, the jury, having found beyond a reasonable doubt that the defendant had attained the age of 18 or more at the time that he committed the offense of murder, and having found beyond a reasonable doubt the existence of

a statutory aggravating factor, have considered aggravating and mitigating factors relating to the imposition of the death penalty in this case.

*We are unable to conclude unanimously that there is no mitigating factor or factors sufficient to preclude the imposition of the death sentence upon the defendant William Franklin. We cannot unanimously find that the court shall sentence the defendant to death."* (Emphasis added.) See IPI Criminal 2d Nos. 7A.16, 7A.17.

After the instructions, the circuit court informed the jury that it would be permitted to take the exhibits, instructions and verdict forms into the jury room during its deliberations. At that point the circuit court made the statement to which the defendant assigns error, which, when considered in context, refers to the duty of all 12 jurors either to sign one verdict form unanimously or the other unanimously. This statement did not connote, as the defendant contends, that the jurors were required to reach a unanimous verdict of either death or imprisonment. Therefore, the statement was consistent with the jury instructions.

The defendant next asserts that he was denied effective assistance of counsel. The defendant maintains that his counsel erred in: (1) making certain disparaging remarks about him during closing arguments; and (2) failing to object to prosecutorial comments, the admission of photographs into evidence, jury instructions, and the constitutionality of the Illinois death penalty status.

The standard for assessing the effectiveness of defense counsel's performance at a capital sentencing hearing was set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. The defendant must show: (1) that his counsel's performance was so deficient as to fall below an objective standard of reasonableness under "prevailing professional norms"; and (2) that the deficient performance so prejudiced the

defense as to deny the defendant a fair trial. (466 U.S. at 687-88, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65.) To establish the deficiency of counsel's performance, the defendant must overcome the "strong presumption" that his counsel's representation fell within the "wide range of reasonable professional assistance." (466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) As such, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

First, the defendant argues that during closing arguments his counsel denigrated him as a human being, resulting in a denial of his sixth amendment right to counsel. The defendant assigns error to the following remarks:

"All I can do here is to try to reason with you and to try to convince you that nothing would be served by sending William Franklin to his death.

There's no way that I or any rational person could ever attempt to condone the actions of a man who would do this. I'd have to be crazy to tell you to look at those pictures and say that this isn't the actions of an animal. The hands that did that was a cold, premeditated, ruthless individual.

\* \* \*

If doing that, if condemning William Franklin to die would in any way bring back James Roland or Elgin Evans, I would be the first one to say go ahead and do it.

But that's not why we're here. We all know that's not going to happen. He stole their lives. He cheated them out of the very things he enjoys; a chance to see his [sic] children grow up.

\* \* \*

[I] think that [revenge] has no place in the proceedings before us. Because I think that would put us in the same level, the same [plateau], the same milieu as Wil-

liam Franklin who takes it upon himself to execute people.

\* \* \*

But there [are] two individuals here. For how is it that a man could behave so ruthlessly and brutally in one moment and be so loving and kind the next?

[T]he person who carries out the sentence is going to act in just as coldly and calculatedly and premediatedly a fashion as William Franklin did."

Having considered these excised statements in context, it cannot be said that defense counsel was deficient for pursuing this line of argument or that these remarks prejudiced the defendant.

Defense counsel took great pains in emphasizing that the defendant personified two individuals: one who was ruthless and brutal and the other who was loving and kind. Defense counsel admitted that the defendant committed terrible acts, but also attempted to underscore the mitigating evidence which tended to reveal the defendant's good side. The defendant presented the testimony of seven of his children with the intention of showing the positive impact he has had on their lives. One of the defendant's sons read a letter that the defendant wrote to him in which the defendant spoke of the difference between the lower self, which is common, banal and evil, and the higher self, which is compassionate, merciful and loving. During closing arguments, defense counsel highlighted this letter, arguing that the imposition of the death sentence would result in the loss of both sides of the defendant. In this regard, defense counsel appealed to the jury's sense of morality. Defense counsel stressed the heavy burden cast upon the jury in imposing the death penalty.

The evaluation of counsel's conduct cannot properly extend into areas involving the exercise of professional judgment, discretion or trial tactics. (*People v. Mitchell*

(1984), 105 Ill. 2d 1, 12.) The position defense counsel pursued in closing arguments was a matter of trial strategy. The fact that the jury did not accept that position does not mean that defense counsel was ineffective. (*People v. Harris* (1988), 123 Ill. 2d 113, 157-58.) Accordingly, the defendant was not denied his sixth amendment right to counsel.

The defendant also contends that his counsel's failure to object to the following alleged errors constituted ineffective assistance of counsel: (1) the State's characterization of him as a "hit man" at closing arguments; (2) the admission of photographs into evidence during the second stage of the sentencing hearing; (3) the court's oral instruction to reach a "unanimous verdict"; (4) the "sympathy" instruction; and (5) the absence of the *Gacho* instruction on the alternative mandatory sentence of natural life imprisonment. As noted above, none of these allegations constituted error. The defendant's contention is therefore without merit.

Finally, the defendant contends that his counsel's failure to object to the constitutionality of the death penalty statute constituted ineffective assistance of counsel. Although the defendant failed to object, he did raise this issue in his post-sentencing motion. While it would have been appropriate to object to the constitutionality of the statute (*People v. Caballero* (1989), 126 Ill. 2d 248, 270), counsel was not ineffective in failing to preserve for review an issue which has previously been resolved against him (*People v. Stewart* (1984), 104 Ill. 2d 463, 481-82). Each of the defendant's claims has consistently been resolved against him. The discretion granted to the prosecution as to whether to seek the death penalty is not violative of the eighth and fourteenth amendments (*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 543), and such discretion does not vest the prosecution with a judicial function in violation of the separation of powers doc-

trine (77 Ill. 2d at 535-36). Furthermore, the State is not required to prove the absence of mitigating factors beyond a reasonable doubt (*People v. Johnson* (1987), 119 Ill. 2d 119, 151), and the statute does not place an impermissible burden of proof on the defendant to establish mitigating factors (*People v. Orange* (1988), 121 Ill. 2d 364, 390). Finally, the statute does not lack adequate safeguards to prevent the arbitrary or capricious imposition of the death penalty. *People v. Coleman* (1989), 129 Ill. 2d 321, 349-50; *People v. Whitehead* (1987), 116 Ill. 2d 425, 465.

We are of course aware that a district court judge held the death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) unconstitutional upon claims that it gives the prosecutor too broad a discretion whether to ask for the death penalty and that the statute lacks adequate notice provisions as to when the death penalty would be sought (*United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246), claims this court has consistently rejected (see *People v. Silagy* (1984), 101 Ill. 2d 147, 161-62; *People v. Gaines* (1982), 88 Ill. 2d 342, 369). This court in *People v. Del Vecchio* (1989), 129 Ill. 2d 265, commented:

"We are aware of the opinion of the United States District Court for the Central District of Illinois, filed April 29, 1989, in the case of the *United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246. In that case the court held the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) unconstitutional. In passing on Federal constitutional questions, State courts and lower Federal courts have the same responsibility and occupy the same position. Until the Supreme Court of the United States has spoken, State courts are not precluded from exercising their own judgments on Federal constitutional questions. Because lower Federal courts exercise no appellate jurisdiction over State courts, decisions of lower Federal courts are not conclusive on State courts,

except insofar as the decision of the lower Federal court may become the law of the case. *United States ex rel. Lawrence v. Woods* (7th Cir. 1970), 432 F. 2d 1072; see also *City of Chicago v. Groffman* (1977), 68 Ill. 2d 112; *People v. Stansberry* (1971), 47 Ill. 2d 541." 129 Ill. 2d at 295-96.

## CONCLUSION

For the reasons set forth above, we affirm the defendant's conviction and sentence of death. We hereby direct the clerk of this court to enter an order setting Tuesday, May 15, 1990, as the date on which the sentence of death entered by the circuit court of Cook County shall be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). The clerk of this court shall send a copy of this mandate to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution where the defendant is confined.

*Affirmed.*