**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 140510-UB

Order filed February 25, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-14-0510 Circuit No. 11-CF-313 |
| | ) | |
| THOMAS WATSON, | ) ) | Honorable Kathy Bradshaw-Elliott, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE SCHMIDT delivered the judgment of the court.
Justice McDade specially concurred.
Justice Wright dissented.

**ORDER**

¶ 1     *Held*: The evidence was sufficient to prove defendant guilty of aggravated criminal sexual abuse. The trial court did not abuse its discretion in allowing the jury to view a video of defendant's confession in the jury room on a laptop during deliberations. The prosecutor's statements during closing arguments did not result in reversible error. We lack jurisdiction to address defendant's as-applied constitutional challenge to the statutory scheme of lifetime penalties that apply to convicted sex offenders.

¶ 2     Defendant, Thomas Watson, appeals his conviction for aggravated criminal sexual assault.

Defendant argues (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt,

(2) the trial court abused its discretion in allowing the jury to view a video recording of defendant's confession multiple times in the jury room, (3) the prosecutor's statements during closing arguments constituted prosecutorial misconduct, and (4) the statutory scheme of lifetime penalties that apply to convicted sex offenders is unconstitutional as applied to defendant. We previously affirmed the judgment of the trial court as to all issues. *People v. Watson*, 2018 IL App (3d) 140510-U.

¶ 3        Defendant filed a petition for leave to appeal to the supreme court. The supreme court denied defendant's petition for leave to appeal, but issued a supervisory order directing us to vacate our prior judgment in *Watson*, 2018 IL App (3d) 140510-U and consider the effect of the opinion in *People v. Bingham*, 2018 IL 122008 on the issue of whether a defendant may raise the constitutionality of the Sex Offender Registration Act (SORA) (730 ILCS 150/1 *et seq.* (West 2016)) on direct appeal. Accordingly, we vacate our prior judgment. We find that *Bingham* does not affect the first three issues defendant raises on appeal, and we affirm as to those issues. Pursuant to the holding in *Bingham*, this court lacks jurisdiction to consider defendant's as-applied constitutional challenge to the statutory scheme of lifetime penalties that apply to convicted sex offenders, and that portion of the appeal is dismissed.

¶ 4                                              I. BACKGROUND

¶ 5        On June 8, 2011, the State charged defendant by information, later supplanted by indictment, with aggravated criminal sexual assault (720 ILCS 5/12-14(b)(i) (West 2008)) in that defendant committed an act of sexual penetration with D.M. by putting his penis in D.M.'s anus. The indictment stated the incident occurred on or between August 1, 2008, and February 28, 2009. The indictment alleged that defendant was under 17 years old at the time of the incident and D.M.

was under 9 years old. Evidence later adduced at trial showed that defendant was 15 years old at the time of the incident, and D.M. was 5 years old.

¶ 6        The case proceeded to a jury trial. D.M. testified via closed circuit television. D.M. stated that he was 10 years old. D.M.'s mother was Latrice Miles. D.M. had two brothers: 13-year-old E.W. and 8-year-old E.G. D.M. lived with his mother. He had previously lived with Yolanda Young and her two sons while his mother was in jail. Yolanda's sons were defendant and Deante. The following exchange occurred between the prosecutor and D.M.:

"Q. Okay. Was there anything about Yolanda's house that you did not like?

A. Thomas raped me.

Q. And you said Thomas. So who is he?

A. Yolanda's—

Q. Do you know his last name?

A. Watson.

Q. Okay, and you said that he raped you. What does that mean?

A. Pushed force.

Q. Okay. Pushed force with what?

A. His private.

Q. His private to what?

A. My butt."

¶ 7 D.M. testified that defendant raped him on the floor in Yolanda's room, which was the living room. It only happened on one occasion. Only D.M. and defendant were in the room; Deante, E.W., and E.G. were outside, and Yolanda was at work. While D.M. was watching television, defendant came over to D.M. and pulled D.M.'s clothes down. Defendant pulled down his own clothes as well. Defendant got on top of D.M. and then defendant "put his private in [D.M.'s] butt." D.M. told defendant to stop, but defendant did not listen. Defendant eventually got off D.M. Then, D.M. pulled up his clothes, went outside, and told E.W. what happened. After the incident, D.M. noticed that his "butt" was bleeding when he went to the bathroom. The prosecutor asked D.M. if there was blood in Yolanda's room, and D.M. said no.

¶ 8 When Yolanda returned home that evening, E.W. told her what happened. E.W. told D.M. that defendant got in trouble after he told Yolanda about the incident. D.M. was not with E.W. when E.W. told Yolanda about the incident. Yolanda did not talk to D.M. about the incident. D.M. and his brothers stayed at Yolanda's house for a few more weeks after the incident. D.M. did not know why they had to leave Yolanda's house.

¶ 9 After moving out of Yolanda's house, D.M. and his brothers lived with Claudine Christian. When they were living with Christian, E.W. told Christian about the incident between defendant and D.M. D.M. never talked to Christian about the incident. Christian took D.M. to see his mother, and D.M. told his mother about the incident with defendant for the first time.

¶ 10 D.M. went to the Children's Advocacy Center (CAC) and talked to a woman who worked there. The prosecutor asked D.M. how many times he went to the CAC. D.M. replied, "Don't know." The prosecutor asked D.M. if he told the woman about defendant the first time he went to the CAC or a different time. D.M. said he told her the first time. The prosecutor asked D.M. if he

remembered telling the woman at the CAC that nothing happened with defendant. D.M. replied, "Don't know."

¶ 11      On cross-examination, defense counsel asked D.M., "Now you said that you don't remember how many times you talked to the lady at the CAC interview?" D.M. replied, "Twice." Defense counsel asked D.M. if he remembered telling the woman at the CAC that "nothing happened at all." D.M. replied, "No." Defense counsel asked D.M. what he thought he told the woman the first time he went to the CAC. D.M. replied, "That [defendant] raped me." Later during cross-examination, defense counsel asked if D.M. remembered talked to the woman at the CAC a second time, and D.M. said no.

¶ 12      Defense counsel asked D.M. if his mother told him what rape meant, and D.M. said yes. D.M. said that his mother told him what rape meant "[a] few days ago when I was talking." Defense counsel asked, "So when you talked to the lady at the CAC interview room, was that before you talked to your mom about what the term rape meant?" D.M. said, "Yes." Defense counsel asked D.M. who told him to use the term "rape" when he talked to the woman at the CAC. D.M. replied, "Don't remember." Defense counsel then asked, "So you talked to somebody who told you the term rape before your mother explained it to you?" D.M. said, "No." Defense counsel then asked, "When you talked to [the woman at the CAC], you told her you had been raped but you didn't know what that meant?" D.M. replied, "Yes."

¶ 13      Defense counsel asked D.M. if he remembered telling the woman at the CAC that his "butt was bleeding" because he fell off his skateboard. D.M. replied, "Yes." Defense counsel asked D.M. if he fell off his skateboard. D.M. said, "No." Defense counsel asked D.M. why he told the woman at the CAC that he fell off the skateboard. D.M. replied, "Don't know."

¶ 14	Defense counsel asked D.M. if he remembered telling the woman at the CAC that defendant was a lot of fun and he got along with defendant fine. D.M. said, "Yes." Defense counsel asked if D.M. remembered telling the woman that defendant never did anything to him. D.M. said, "Yes." The following exchange occurred:

> "Q. Do you remember denying that he ever touched you? Do you understand that question?
>
> A. No.
>
> Q. Okay. Do you know what the word denying means? Okay. It means to say it didn't happen. Did you tell [the woman at the CAC] that it didn't happen?
>
> A. It did.
>
> Q. Okay, and on what time did you tell [the woman at the CAC] that it did happen?
>
> A. The second time.
>
> Q. Okay. So the first time you did say it didn't happen; is that correct?
>
> A. Yes."

¶ 15	Defense counsel asked defendant if he ever discussed the incident with E.W. D.M. replied, "I only told him I got raped." Defense counsel asked if D.M. told E.W. on the day it happened, and D.M. said yes. Defense counsel asked, "But you didn't know what rape was; did you?" D.M. said, "No." Defense counsel asked, "So you used that word and told him you got raped?" D.M. said, "Yes."

¶ 16 Defense counsel asked D.M. if E.W. had talked to D.M. about the incident. D.M. said, "Yes." Defense counsel asked, "And does he bring it up with you a lot?" D.M. replied, "Sometimes." The following exchange occurred:

"Q. And he tells you what he believes happened, right?

A. Yes.

Q. And he's told you that over and over?

A. Yes.

Q. And he's told you different situations of this story?

A. Yes.

Q. So do you have any actual memory of this?

A. No.

Q. So all you're telling us today is what [E.W.] told you?

A. Yes."

¶ 17 On redirect examination, the prosecutor asked D.M. if what he said happened with defendant was something that D.M. remembered happening. D.M. said, "Yes." The prosecutor asked D.M. if it was something he wanted to talk about. D.M. said "No." The prosecutor asked, "What you told us happened with [defendant], is that something that really happened?" D.M. said, "Yes." The prosecutor asked, "When [E.W.] talks to you about what happened with [defendant], is he telling you what to say?" D.M. replied, "No."

¶ 18 Defense counsel then asked D.M. the following questions on recross-examination:

"Q. [D.M.], I asked if you had any actual memory of this

happening and you said no; is that correct?

A. Yes.

Q. So what you know about this incident is something your brother told you, right?

A. Yes.

Q. Okay, and you think it's wrong because someone told you it happened and it was wrong?

A. Yeah."

¶ 19    The prosecutor then asked D.M. the following questions on redirect examination:

"Q. [D.M.], when [defense counsel] asked you if you have no memory of the incident, do you know what she's asking you?

A. What happened.

Q. Okay. Does she—do you understand what her question is to you?

A. No.

Q. Okay. When you're talking about what happened with [defendant], is that something that really happened or is that something that somebody told you that happened?

A. Really happened.

Q. And when you were telling us today what [defendant] did to you in the—in the living room in Yolanda's room, is that something that really happened?

A. Yes."

¶ 20      Defense counsel then asked D.M. the following questions on recross-examination:

"Q. So [D.M.] you told me that the reason you know it happened is because your brother told you. Is that what you told me?

A. Yes.

Q. So when you tell the prosecutor that it really happened, you mean your brother told you it really happened?

A. Yes.

Q. Because you don't remember it? That's a yes?

A. Yes.

Q. So you do not remember this happening. Do you—do you remember it specifically in your own mind?

A. Yes.

Q. So is it—is what you're remembering what you were told by other people?

A. No.

Q. Okay. So how do you know that it really happened?

THE COURT: Do you need her to ask the question again?

THE WITNESS: Yes.

THE COURT: Okay.

BY [Defense Counsel]: (resuming)

Q. How do you know what happened to you?

A. He did it to me.

> Q. How do you know that? You do not have an answer for that question. So you don't know how you know? Is that fair to say that you don't know how you know?
>
> A. Yes."

¶ 21    The prosecutor then asked D.M. on redirect examination if the incident was something he did not want to talk about. D.M. replied, "Don't know." The prosecutor stated, "You say I don't know a lot. Are you saying I don't know because you don't want to answer?" D.M. said, "Yes." The prosecutor asked, "Is this something that you want to think about? Do you want to think about what [defendant] did to you? Okay. Why do you want to think about it?" D.M. replied, "Don't know." The judge then offered D.M. a Kleenex and some water. The prosecutor asked D.M. why he was crying. D.M. replied, "I don't know."

¶ 22    The State called Christian as its next witness. Christian testified that she was previously a foster parent to D.M. and his brothers. In April 2011, Christian spoke to the children about an individual that had been driving around their school and trying to persuade children to get into his vehicle. Christian told the children not to enter the vehicle or they could be molested. At that point, E.W. said that D.M. had been molested. E.W. explained what had happened to D.M. Christian then asked D.M. and E.W. to follow her into another room. D.M. told Christian "that when he was in his mom's friend's home she had a son that was there and that he had sex with him from behind, and he made his butt bleed." D.M. told Christian that he told Yolanda, and Yolanda gave D.M. a bath and told him not to tell. Christian then called Miles, D.M.'s mother, and asked if anyone had reported that incident. Miles seemed surprised to hear about the incident, and she called the police. D.M., E.W., and Christian's adult son met with a police officer that night. Christian later gave a written statement at the CAC.

¶ 23        Miles testified that she was the mother of D.M., E.W., and E.G. Miles said that Yolanda used to be "like a sister" to her. In 2008, Miles and her children moved in with Yolanda and Yolanda's two sons, defendant and Deante. Miles was incarcerated in the county jail in August 2008. While Miles was in jail, the Department of Children and Family Services (DCFS) informed her that Yolanda surrendered Miles's children to DCFS. Yolanda never told Miles that she was going to leave Miles's children in the care of DCFS. The children briefly lived with Miles's uncle and then went to live with Christian.

¶ 24        While the children lived with Christian, Miles was on work release in Aurora, Illinois. Eventually, Miles finished her work release and obtained her own apartment. She was working with DCFS for the return of her children, and she had visitation with her children. Christian called Miles and told her about the incident. Miles called the police and told her DCFS caseworker about the incident. Miles also went over to Yolanda's house and talked to Yolanda and defendant about the allegations.

¶ 25        E.W. testified that he was 13 years old. E.W. stated that, at the time of the incident, he and his brothers lived with Yolanda, Deante, and defendant. E.W. came home from school early on the day of the incident because he was sick. When E.W. got home, D.M. was sleeping on the couch in the living room and defendant was in the back room. Defendant called E.W. into the back room to play video games with him. Defendant then left the room. A few minutes later, E.W. heard D.M. crying. E.W. ran into the living room. Defendant was on the computer, and D.M. was on a pile of laundry with his pants down. D.M. was crying. E.W. noticed a blood stain on the floor by the couch. E.W. asked D.M. what was wrong, and D.M. continued to cry. Later that day, D.M. told E.W. that defendant "stuck his private in [D.M.'s] butt." The prosecutor asked E.W. if he knew where the blood by the couch came from. E.W. replied: "Not at first but when [D.M.] told me he

- 11 -

wiped his butt when he was using the bathroom, he told me that he saw blood so I was pretty sure that that was his."

¶ 26    E.W. and D.M. went to Yolanda together and told her what happened. Yolanda then took defendant into the back room and talked to him. Yolanda was carrying a fly swatter. E.W. believed Yolanda "wooped" defendant because he heard "bumping and crying." After that, E.W. and his brothers stayed with Yolanda for about a week. Yolanda then surrendered them to DCFS.

¶ 27    Eventually, E.W. and his brothers went to live with Christian. At Christian's house, D.M. told E.W. that defendant "raped him in the booty." D.M. asked E.W. what rape meant, and E.W. told him "that rape is when somebody stick [*sic*] their private in you with force." E.W. and D.M. talked to Christian about what had happened with defendant. E.W. testified that he told D.M. to "say rape" during the trial so "that way you guys can know what happened to him."

¶ 28    Kristin Jackson testified that she was the executive director of the Child Network, which was an umbrella organization for the CAC and the court-appointed special advocates. Jackson explained that the CAC was "a center that provides a coordinated multi-disciplinary team approach to child abuse investigation." The CAC worked with a multi-disciplinary team that also included law enforcement, DCFS, the State's Attorney's office, mental health, and medical. The CAC also provided "child focused forensic interviews and advocacy services." Jackson explained that "[a] forsensic interview is a neutral fact finding interview done at the request of either law enforcement or DCFS when there are *** allegations of child abuse."

¶ 29    On May 4, 2011, Jackson interviewed D.M., E.W, and E.G. upon the request of DCFS. Detective Mark Miramontes was present for the interviews. The CAC recorded the interviews. At the first interview, D.M. did not disclose any abuse. However, both of D.M.'s brothers said that D.M. told them that defendant assaulted him, so Jackson and the others on the team decided to

interview D.M. again. On June 21, 2011, Jackson conducted a second interview of D.M., which the CAC also recorded.

¶ 30        The State played the video recordings of the interviews for the jury. During D.M.'s first interview, D.M. said he was eight years old and in second grade. D.M. stated that he lived with his mother and father and their friends Otis, Pap, and Clarence.[1] E.W. and E.G. also lived with him. Jackson asked D.M. if his mother and father told him why he was coming to the CAC, and D.M. said no. Jackson explained: "Our job here is just to make sure that kids are safe, that's all. So, safe at your house or anybody else's house you go visit or even at school. All right, so that's the kind of things we're going to talk about."

¶ 31        Jackson asked D.M. if something happened to him that did not make him feel safe or that he did not think was okay. D.M. said no. Jackson asked D.M. if he had talked to his mother about something that might have happened to him, and he said yes. Jackson asked D.M. what happened. D.M. responded, "Some people be fighting my brothers and I, and I be fighting back." D.M. said the people who fought him were his friends from school. Jackson then showed defendant a drawing of a nude boy and asked him if the boy had any body parts that people should not touch. D.M. pointed to the boy's genitals and buttocks. Jackson asked D.M. if anyone had ever touched him or tried to touch him in those places. D.M. said no.

¶ 32        D.M. said he used to live with Yolanda and her sons, defendant and Deante. D.M.'s brothers lived there too. Jackson asked D.M. if he liked living there, and he said yes. D.M. said it was fun living there, and they would go out to eat and skateboard. Jackson asked if anything happened at Yolanda's house that D.M. did not like. D.M. said no. Jackson asked if defendant or

---

[1]Although D.M. said that he lived with his mother and father, the testimony of other witnesses shows that he lived with Christian at the time of the interview rather than his biological parents.

Deante ever did something he should not have done or was not nice. D.M. said no. Jackson again asked D.M. if anyone ever touched him or tried to touch him on his genitals or buttocks. D.M. said no. Jackson asked if D.M. was scared to talk to her about certain things, and D.M. said no.

¶ 33    Jackson then interviewed E.W. E.W. said he was 10 years old and in fourth grade. E.W. said he lived with Christian; her boyfriend, Otis; her son, Johnny; and someone named James. D.M. and E.G. lived there as well. E.W. said he had lived with Christian for two years. Before E.W. and his brothers lived with Christian, they lived with Yolanda and her sons, Deante and defendant, while their mother was in jail. Yolanda sent the boys to DCFS.

¶ 34    Jackson asked E.W. if he ever felt unsafe at those houses. E.W. said no. He then said defendant "acts gay a lot." Jackson asked E.W. what defendant did when he acted gay. E.W. said that on one occasion, he was in Deante's room playing video games with defendant. Defendant told E.W. he was going to get some water and left the room. E.W. heard D.M. scream and then heard defendant moving around. E.W. walked into the living room. D.M. was on the floor crying. E.W. saw blood on the floor by the side of the couch. E.W. asked what was wrong with D.M., and defendant said he did not know.

¶ 35    D.M. told E.W. that defendant "raped him in the booty." E.W. explained that meant defendant put his private part in D.M.'s "butt." E.W. told Yolanda where the blood came from, and she "whooped" defendant. Yolanda asked D.M. what happened to him, and he told her defendant raped him. Yolanda sent E.W. and his brothers to DCFS approximately two days later. E.W. said D.M. "just now" told him what happened because D.M. was afraid to tell him in front of defendant. D.M. said it only happened once.

¶ 36    Jackson then interviewed E.G. E.G. said he was six years old. E.G. used to live with Yolanda and her two sons. One of her sons was defendant. E.G. said defendant was not nice. D.M.

told E.G. that defendant raped D.M. Jackson asked E.G. what that meant, and E.G. said D.M. bled on his back. E.G. did not see it happen.

¶ 37 Jackson interviewed D.M. a second time on June 21, 2011. Like in the first interview, Jackson asked D.M. where he lived at that time and where he had lived in the past. Jackson asked D.M. if liked living with Yolanda, and D.M. said yes. Jackson asked D.M. if he got along with defendant, and D.M. said yes. Jackson asked if defendant ever did anything that was not nice. D.M. shook his head, indicating no. Jackson showed defendant a picture of a nude boy and asked if the boy had any body parts people should not touch. D.M. pointed to the boy's genitals, buttocks, and chest. Jackson asked D.M. if anyone ever touched him on those body parts or tried to. D.M. said no.

¶ 38 Jackson asked D.M. to tell her what defendant was like. D.M. said defendant was fun. They would walk and skateboard together. Deante and defendant used to babysit D.M. when he lived at Yolanda's house. They would play games and watch television. Jackson asked if anything ever happened at Yolanda's house that made D.M. feel uncomfortable or that should not have happened. D.M. said no. Jackson asked twice if D.M. ever talked to his brothers about something that happened to his body that was not okay. D.M. said no both times. Jackson asked D.M. if his brothers told him what they talked to Jackson about the last time they were there. D.M. said no. Jackson asked if D.M. ever talked to Christian about someone doing something to his body that he did not think was okay. D.M. said no. Jackson asked if D.M. knew if either of his brothers talked to Christian about that, and D.M said no. Jackson asked if Christian ever asked D.M. questions about "that kind of stuff," and D.M. said no.

¶ 39 Jackson said she thought D.M.'s brothers said something about someone doing something to D.M. Jackson asked D.M. who his brothers might have said did something to him. D.M. said

defendant. Jackson asked D.M. if he knew what they might have said defendant did. D.M. said no. Jackson asked D.M. why he thought his brothers said defendant did something. D.M. shrugged. Jackson told D.M. that his brothers told her something happened to him, and Jackson needed to talk to D.M. about it.

¶ 40 Jackson asked D.M. if something happened to him, and D.M. said yes. Jackson asked if someone did something to D.M., and D.M. said yes. Jackson asked, "Who was that?" D.M. said it was defendant. Jackson asked how old D.M. was when it happened, and D.M. said he was seven years old. Jackson asked D.M. where it happened, and D.M. said it happened at Yolanda's house in her room. Yolanda was at work. Deante, E.W., and E.G. were in Deante's room playing games.

¶ 41 Jackson asked, "Can you tell me what [defendant] did?" D.M. replied, "Raped me." Jackson asked D.M. if he knew what rape meant. D.M. said no. Jackson asked if it involved body parts. D.M. said yes. Jackson asked what body parts were involved. D.M. pointed to the buttocks on the drawing of the boy. Jackson asked if it involved that body part on D.M. or defendant. D.M. replied, "Me." Jackson asked what happened to that body part. D.M. replied, "It was bleeding." Jackson asked what made it bleed. D.M. said he fell off a skateboard. Jackson asked if defendant used any of his body parts when he raped D.M. D.M. said yes and pointed to the genitals on the drawing of the boy. Jackson asked what that body part was called, and D.M. said "private." Jackson asked what defendant's private did, and D.M. said, "put in my butt."

¶ 42 D.M. said he was on the floor watching television when it happened. Jackson asked how D.M.'s clothes were when defendant raped him, and D.M. said "down." Jackson asked how D.M.'s clothes got down, and D.M. said defendant pulled them down. D.M. said defendant's clothes were down too. D.M. was lying on his belly and defendant was on top of him. D.M. said it only happened once. D.M. said he told E.W. what happened, but D.M. did not remember when he told E.W. D.M.

also told Yolanda when she returned home on the day defendant raped him. Yolanda said defendant was "on punishment." Jackson asked D.M. if he still saw defendant. D.M. said, "No, he [*sic*] in jail." Jackson asked why defendant was in jail. D.M. replied, "He raped me."

¶ 43        Detective Miramontes testified that he learned of a DCFS investigation involving criminal sexual assault. Miramontes was present at the CAC during the interviews of D.M., E.W., and E.G. Miramontes observed the interviews. Approximately one month later, Miramontes and another detective, Steven Hunter, went to defendant's house. They asked the woman who answered the door if defendant was home, and she said he was. Defendant came out of the bedroom where he had been sleeping. Miramontes explained who he was and asked defendant to come to the police station to speak with him. Defendant agreed to go to the station. The officers drove defendant to the station. When they arrived, they took defendant to an interview room. Defendant was 18 years old at the time of the interview. During the interview, defendant seemed to understand the questions.

¶ 44        The prosecutor played the video recording of defendant's interview for the jury. In the video, Miramontes read defendant his *Miranda* rights. Miramontes told defendant, "If you understand your rights, I need you to initial the first four lines and then sign your name there for me." Defendant then asked, "My initials?" Miramontes said yes. Defendant said, "Like 'T'—?" Miramontes responded, "Yeah. What are your initials? T.W. Yep." Defendant then initialed and signed the *Miranda* sheet.

¶ 45        Miramontes asked defendant who he lived with. Defendant said he lived with Yolanda, Deante, and his sister, Tamesha Young. Defendant said he was in high school. Defendant planned to graduate the next year and then attend Kankakee Community College. Defendant said he wanted to study computers and sing in a choir after high school.

¶ 46        Defendant said approximately three years earlier, Miles and her three sons lived with defendant and his family. Miles went to jail, and her children continued to live with defendant's family. Eventually, Yolanda could not support Miles's children financially, and she surrendered them to DCFS. Defendant said Miles's children loved Deante and his video games. Defendant said the children also loved him because he was "the sweetest person." Defendant said he would take the children outside to play. Miramontes asked defendant if the children ever got on his nerves. Defendant replied, "No, no, no. Those kids were just sweet kids. I didn't do anything to none of 'em." Defendant said he loved the children like they were his brothers. Defendant said he no longer saw the children frequently because they were in foster care. Miramontes asked defendant if he missed the children, and defendant said yes.

¶ 47        During the interview, defendant volunteered that Miles came over to his house about two months earlier and accused him of raping D.M. Defendant said he never touched D.M. Defendant said, "Why would I want to do that? When I was eight years old, I got raped." Miles told defendant that D.M. said defendant took him in the bathroom in Yolanda's house and raped him. Then, when D.M. used the bathroom, there was blood on the toilet. Miramontes asked defendant why D.M. would say that. Defendant replied: "I wouldn't know because they sayin' it happened three years ago. Those kids were there when I was sixteen. And I'm only eighteen now. And I haven't seen them in like three or four years afterwards."

¶ 48        Miramontes asked defendant if he and the children ever "play wrestle[d] each other." Defendant said yes; defendant explained that the children would often jump on his back. Defendant said the children loved to wrestle.

¶ 49        Hunter asked defendant if he could think of a time when he was in the bathroom with D.M. Defendant said one time when D.M. was sick, defendant gave D.M. a bath. Hunter asked what

other times defendant was in the bathroom with D.M. Defendant said he gave D.M. baths on other occasions as well. Defendant bathed D.M. approximately every three weeks. Miramontes asked defendant if he ever took D.M.'s clothes off in the living room to give him a bath. Defendant said no. Miramontes asked if defendant ever saw any blood on the toilet. Defendant said no. Defendant explained: "Mom said that [D.M.] had a runny nose one day."

¶ 50    Approximately 20 minutes into the interview, Hunter said: "[Defendant], you're not being truthful." Hunter said, "We all make mistakes." Hunter stated that people like defendant who have been victimized often reenact being victimized. Hunter said that the detectives' report regarding D.M.'s allegations was "very descriptive, and it's not something that a young person would just come up with." Hunter told defendant to think back to the day in the living room when D.M. was bleeding. Hunter said DNA lasts a long time and any bodily fluids from defendant or D.M. would still be there. Miramontes told defendant that they needed to hear the truth so they could help defendant and the children. Miramontes said that defendant needed to "think about DNA" as well. Miramontes said that the children's account of the incident was very descriptive and that "these kids just don't make stuff up like that." Miramontes told defendant he would feel "100 times better" if he "[got] it off his chest." Defendant replied: "I have really nothing on my chest. That's what I'm trying to say. I have nothing on my chest. I don't know anything about no blood on the couch." Hunter said, "Okay, let's say there was no blood. What happened? What happened? What happened between you and [D.M.] that day on the couch?" Defendant said he remembered a day where he and D.M. were watching television in the front room. Defendant and D.M. started to wrestle, and defendant accidentally hit D.M. in the nose. D.M.'s nose started bleeding, and the blood got on the couch and toilet. Yolanda walked in. She took D.M. to the bathroom and was upset with defendant for hitting D.M.

- 19 -

¶ 51 Hunter told defendant that there was nothing in their report about D.M. getting hit in the nose. Defendant said, "Well, I have no idea—" Hunter said, "Well, you have some idea because you did indicate that there was blood, but we know it didn't come out of his nose." Defendant shrugged. Hunter told defendant that he did not hit D.M. in the nose. Defendant said he did hit D.M. in the nose, and it was an accident. Hunter said that was not the truth.

¶ 52 Hunter told defendant they were not angry at him for lying to them. Hunter said, "In a way, we expect you to lie." Hunter told defendant that their job was to get the truth to come out for closure. Hunter said that defendant and D.M. might need help. Hunter told defendant to think about the time someone sexually abused him as a child. Hunter said he knew defendant would tell them the truth because he could "see it" in defendant. The detectives told defendant that he needed to put the incident past him so that he and D.M. could move on and have closure.

¶ 53 Hunter then asked, "So, did you have sex with him on the couch?" Defendant sat silently for approximately 30 seconds. Hunter moved his chair closer to defendant and repeated the question. Defendant sat silently for about 10 seconds. Hunter again asked, "Did you have sex with [D.M.] on the couch? Is that why his anus was bleeding?" Defendant sat silently. Hunter said, "We're halfway there, man." Miramontes said, "You'll feel a lot better. You've had this inside you for the last two years." Hunter said, "And it had to hurt him, you know? Because he was bleeding." Hunter again asked defendant if he had sex with D.M. on the couch. Defendant sat silently. Miramontes asked if D.M. was bleeding from his anus. Hunter told defendant they needed him to "verbalize" whether D.M. was bleeding from his anus.

¶ 54 Defendant sat silently for a few seconds. Defendant then said, "Well, um, I guess I, uh, I did, um, I did it, like, put it, like, one time, then I took it out, and I was like, 'Oh my God, what am I doing? What am I doing, man?' The very, very, very bad thing of what happened to me. I was

- 20 -

like, I told him, I was like, 'I'm so so so so so so so sorry.' " Hunter stated that defendant said he "put it in" D.M. Hunter asked, "Put what in?" Defendant replied, "Me." Hunter asked defendant what he meant by that, and defendant said "sexual." Hunter asked what body part defendant put in D.M., and defendant was silent. Hunter asked defendant if he put his penis inside D.M.'s anus, and defendant said yes. Defendant said, "And then, after that, I was like 'Oh my God, oh my God, what am I doing? What am I doing?" Defendant said he never did it to D.M. again. Defendant did not see D.M. bleed. At this point in the interview, defendant began to cry. Hunter asked defendant if anyone caught him or walked into the room. Defendant said no. Hunter asked defendant if D.M. went to the bathroom after the incident. Defendant said he did not know because he was shocked.

¶ 55    Hunter asked defendant what he did after he was finished, and defendant said he just sat on the couch and thought to himself, "Why did I do that?" The detectives asked defendant if D.M. yelled or screamed, and defendant said no. Hunter asked defendant if he ejaculated. Defendant said, "No, no, because I ain't even do it afterwards. Like, you know, I didn't, you know." Hunter asked, "You said you put your penis inside of him, and—" Defendant said: "And then backed out because I had a vision of me doing this all the way in Tennessee in the park." Hunter asked defendant what happened in Tennessee. Defendant said he went to a park when he was 8 years old and an 18-year-old man sexually assaulted him under the monkey bars. Defendant said he never received counseling after that incident, and he had nightmares about it. Miramontes asked defendant if anyone ever reported that incident. Defendant said yes. Defendant said the police gave the man a warning, and defendant obtained a restraining order against the man. Defendant explained that he did not want the man to go to prison or harm the man's ability to attend school.

¶ 56    Hunter then took defendant to the restroom. Miramontes left the interview room as well. Defendant returned alone after a few minutes. Defendant sat in a chair, put his head down, and cried.

¶ 57    The State rested.

¶ 58    Defendant called Dr. James Simone as his first witness. Simone testified that he was a licensed clinical psychologist. The State stipulated to Simone's qualifications, and the court qualified him as an expert. Simone testified that he administered a written intelligence quotient (IQ) test to defendant on August 26, 2011. Defendant scored a 60 on the IQ test, which indicated a diagnosis of mild mental retardation. A score of 90 to 110 was average.

¶ 59    Simone was aware that defendant was given another IQ test in early 2012, but Simone did not personally administer it. The name of second IQ test was the "Wechsler Abbreviated Scale of Intelligence." Part of that test involved a speaking or oral portion. The results of that test showed that defendant had a verbal IQ of 86, a performance IQ of 63, and a full scale IQ of 73. Defendant's full scale score of 73 indicated borderline intellectual functioning.

¶ 60    Simone testified that he also administered a "*Miranda* Appreciation and Understanding Test" to defendant, which assessed defendant's understanding of his *Miranda* rights. Simone believed defendant received the highest possible score on that test.

¶ 61    Tamesha Young testified that defendant was her brother. On June 6, 2011, a police officer knocked on their door, and Tamesha opened it. The officer asked for defendant. Defendant came out and talked to the police officer. The officer asked defendant to go to the police station to answer questions, and defendant left with the officer.

¶ 62    Yolanda testified that defendant had attention deficit hyperactivity disorder (ADHD). When defendant was three years old, he began taking medication for his ADHD. Defendant began

receiving social security when he was three years old because he had a learning disability. At the time of his arrest, defendant had just finished the eleventh grade. Defendant took special education classes and had an individualized education program. Prior to defendant's arrest, Yolanda ran out of his prescription medication and was unable to refill it. Yolanda stated that if defendant did not take his medication "he would do a lot of talking, fidgeting, wouldn't stop moving, just anxious to—to do other things."

¶ 63 In 2008, Yolanda lived in a small, one bedroom house with her two sons, defendant and Deante. Defendant was 15 years old and Deante was 14 years old. Miles and her three sons moved in with Yolanda after Miles lost her apartment. Miles got arrested approximately two months later. Yolanda agreed that Miles's children could continue to live with her. E.W. had severe asthma. Yolanda had to leave work twice to pick E.W. up from school and take him to the hospital. Yolanda had two jobs but eventually lost them both. Yolanda explained: "[E.W.] needed more attention and they told me I had a choice between [E.W.] and my job, so I had to quit my job." Eventually, Yolanda could not care for Miles's children anymore due to financial constraints. Her lights were "being turned off" and she had no heat. She told Miles's children that she could not keep them any longer and surrendered them to DCFS. Approximately two weeks later, Yolanda told Miles via telephone that she had taken Miles's children to DCFS. Miles was very upset.

¶ 64 When Miles's children lived with Yolanda, the children never told Yolanda that defendant had sexually abused them. The children occasionally bled when they lived with Yolanda due to playing outside, skateboarding, and roughhousing. One of the children hit his nose on defendant's head and got a bloody nose. Some blood got on the couch after that incident, but Yolanda cleaned it up.

¶ 65        Defendant testified that he was 20 years old. Before his arrest, he had just finished eleventh grade. Defendant took special education courses in high school. After high school, defendant wanted to go to college and take computer classes since he liked to play computer games. Defendant also wanted to take choir classes.

¶ 66        Defendant stated that before his arrest in the instant case, he had never been arrested nor had he spoken to police officers. On the day of his arrest, one police officer came to defendant's house. Defendant was sleeping when the officer arrived. Defendant went with the police officer because he did not know that he could refuse. Defendant rode to the police station in the officers' car. When they arrived at the station, the officer took him to an interview room, closed the door, and left. After some time, two officers entered the interview room; one was the same officer that went to defendant's house and the other was a "big black man." Defense counsel asked how defendant felt in the room with the two officers, and defendant replied: "It made me feel crowded. It made me feel like I couldn't move—like I couldn't leave or trapped."

¶ 67        Defendant remembered the video recording of his interview with the officers being played in court earlier. Defendant acknowledged that there was a point on the video recording when he became very quiet. Defense counsel asked why defendant became so quiet, and defendant replied: "Because I was getting upset, and I wanted to just go home." Defendant said he was afraid of the officers because "[t]hey kept calling [him] liars and liars and you're lying, you're lying." Defendant said this made him upset and afraid because the officers "wouldn't let [him] go." Defendant acknowledged that he finally spoke after being silent for awhile, but stated that the statements he made after the silence were untrue. Defendant said it was not true when he told the officers that he "put" himself in D.M. Defendant explained that he said this even though it was not true "[b]ecause [the officers] wouldn't listen to my—the truth I did have and they—they wanted—

they just wanted something so they can get the truth out cause they said to help him and me." Defendant testified that he had never put his penis in D.M.'s anus or otherwise touched D.M. in a sexual manner.

¶ 68    Defendant remembered Miles coming to his house in April 2011 and talking to him about what she thought happened with D.M. Defendant did not remember Miles "go[ing] into specifics."

¶ 69    At the time of defendant's arrest, he had not taken his prescription medication in three weeks because he did not have any. Defendant described how he felt when he was not taking the medication as follows: "Well I really can't concentrate a lot. I get angry real fast. I can't stop moving. I get stressful and–and–and complicated when I'm around strangers and different type of things." Defendant remembered taking an IQ test with Simone. Defendant stated that he was not on his medication when he took that test.

¶ 70    The defense rested.

¶ 71    During closing argument, the State told the jury that it was the judge of the witnesses' credibility, and it should consider the prior statements of the various witnesses in assessing the credibility of their trial testimony. The State summarized the testimony of all the witnesses, pointing out consistencies in the testimony of the State's witnesses and inconsistencies in the testimony of the defense witnesses. The State then argued that D.M. had "no reason to lie about what defendant did to him." The State contended that its witnesses testified truthfully, but the defense witnesses did not.

¶ 72    Defense counsel argued that defendant confessed to a crime he did not commit because he was intimidated by the police. Defense counsel said it would read the jury their "*Miranda* rights as seen through the eyes of [defendant]." Defense counsel argued that, from defendant's perspective, the detectives would have immediately sent him to jail and assumed he was guilty if

he did not talk to them. Defense counsel then noted that defendant had a low IQ. Defense counsel argued that defendant was easily influenced, making his confession unreliable. Defense counsel noted that defendant struggled in his interview with writing his initials and argued, "He's 18 and he doesn't know what his initials are." Defense counsel argued that defendant's confession was consistent with what the police told him, but it was not consistent with D.M.'s or E.W.'s testimony. Regarding D.M.'s statements to Jackson, defense counsel argued: "Unfortunately as I watched the CAC interviews of [D.M.] *** I got the same uncomfortable feeling I get when I watch coercive interrogations." Defense counsel also discussed discrepancies between the testimony of the detectives, defendant, and Tamesha regarding the number of officers that went to defendant's house on the day of defendant's arrest.

¶ 73    In rebuttal, the State disputed defendant's claim that the detectives pressured him into confessing to a crime he did not commit. The prosecutor argued: "You saw [the video of defendant's confession]. Did you see that fairy tale that [defense counsel is] trying to sell you? That did not happen." The State also argued: "Where in that scenario have these two officers ganged up on the poor dumb defendant? It's just not there. That is a fairy tale that [defense counsel] wants to sell you. The reason why the two detectives went together is because it's kind of their protocol."

¶ 74    The State discussed the testimony and statements of D.M., E.W., and Christian. The State argued that D.M. and E.W. had nothing to gain by fabricating their allegations against defendant. The State noted that D.M. was 5 years old at the time of the incident, 8 years old during his interview at the CAC, and 10 years old when he testified at trial. The State argued:

> "So I propose to you that this is something that he still doesn't want
> to talk about. Especially to strangers again. He doesn't know what

the outcome is going to be, but he told you he knows—he said the defendant did it. I know he did it. Nobody put it in his head. Don't believe that fairy tell [*sic*]. He told [Yolanda]. He told [Christian]. He told [Jackson]. No one has told him what to say. He was clear on that. He never ever said that his mom told him what to say, that [Christian] told him what to say, that [E.W.] told him what to say when to come in court—into court. That has not been put in his head."

¶ 75 The court gave the jury instructions, and the jury began deliberating. A few hours later, the jury sent a note to the court asking for trial transcripts and defendant's confession video. The court discussed the requests with the parties. The court determined that the transcripts were unavailable because the court reporter who transcribed the trial was on vacation. The court stated that it believed the jury was entitled to see the confession video since they requested it. Defense counsel did not object to the jury viewing the confession video.

¶ 76 The court asked the parties how they wanted the video to be shown to the jury. The prosecutor stated that she believed they had sent a laptop into the jury room the last time the issue had come up. Defense counsel stated that she was concerned that if they gave the jury a laptop, the jury could replay the video multiple times. Defense counsel asserted that, in the past, the jury had always come into the courtroom to watch videos. The court said that was before they had the ability to show videos on a laptop. Ultimately, the court determined that the parties would set up a laptop in the jury room and then leave the room. The jury could then play the confession video on the laptop.

¶ 77 Approximately three hours later, the jury sent another note saying that it was unable to reach a decision. The court gave the jury a *Prim* instruction. After receiving the instruction, the jury sent a third note saying that they wanted the password to the laptop so they could log back in and watch the confession video again. The jurors decided to break for the evening and begin deliberating again the next day. The court told the parties to have the laptop ready for the jurors in the morning so that they could rewatch the confession video.

¶ 78 The next day, the jury reached a verdict. The jury found defendant guilty.

¶ 79 Defendant filed a motion for a new trial arguing, *inter alia*:

> "The Court erred when it allowed the videotaped statement of the Defendant to be viewed by the jury in the jury room, without supervision, and with free reign to watch said tape repeatedly. Said viewing allowed excessive emphasis to be put on one piece of testimonial evidence, and this was prejudicial to Defendant."

The trial court denied the motion.

¶ 80 The probation department prepared a presentence investigation report (PSI) of defendant, which indicated that defendant had no prior criminal history. The PSI also stated that defendant reported being sexually abused as a child.

¶ 81 At the sentencing hearing, the court noted that defendant faced a range of 6 to 30 years' imprisonment, a term of mandatory supervised release from 3 years to life, and lifetime sex offender registration. The court sentenced defendant to six years' imprisonment. The trial court reasoned that it was "a real sad case on both sides." The court also noted: "It was a one time event not that that really mitigates anything but we see a lot worse cases. Both *** the defendant and the

victim had lousy childhoods. They shouldn't have had them, you know, but they did. He has no criminal record." The court stated that it believed defendant was a victim of sexual abuse.

¶ 82                                                II. ANALYSIS

¶ 83                                   A. Sufficiency of the Evidence

¶ 84        Defendant argues that the trial evidence was insufficient to prove him guilty beyond a reasonable doubt of aggravated criminal sexual assault (720 ILCS 5/12-14(b)(i) (West 2008)). "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Rather, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Id.*

¶ 85        To prove defendant was guilty of aggravated criminal sexual assault, the State was required to prove that defendant committed an act of sexual penetration with D.M. at a time when defendant was under 17 years old and D.M. was under 9 years old. See 720 ILCS 5/12-14(b)(i) (West 2008). "Sexual penetration" is defined as "any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person." *Id.* § 12-12(f).

¶ 86        Here, when viewed in the light most favorable to the State, the evidence was sufficient to prove defendant guilty beyond a reasonable doubt. D.M. expressly testified that defendant put his penis in D.M.'s anus. D.M.'s testimony alone, if believed, was enough for the jury to convict defendant as it established sexual penetration. D.M.'s testimony was corroborated by defendant's video-recorded confession in which defendant confessed that he put his penis in D.M.'s anus. In

describing the incident, defendant cried and appeared to be remorseful. D.M.'s testimony was also corroborated by his pretrial statements to Christian and E.W. Christian testified that D.M. told her "that when he was in his mom's friend's home she had a son that was there and that he had sex with him from behind, and he made his butt bleed." E.W. testified that D.M. told him that defendant "stuck his private in [D.M.'s] butt." D.M. also told Jackson in his second interview at the CAC that defendant raped him. Jackson asked defendant what body parts were involved, and D.M. indicated that his buttocks and defendant's genitals were involved. D.M. said he was bleeding after the incident.

¶ 87        We note that D.M. consistently stated throughout his trial testimony and pretrial statements that the incident happened in Yolanda's living room, defendant put his penis in D.M.'s "butt," and D.M.'s "butt" was bleeding after the incident. E.W. also testified that the incident happened in the living room and that he saw blood. Additionally, defendant stated during his interrogation that the incident happened in the living room, and he put his penis in D.M.'s anus.

¶ 88        We acknowledge that D.M. initially denied being assaulted in his first interview at the CAC, as well as the first portion of his second interview. However, the jury could have reasonably attributed these denials to be a result of fear or trauma. As the trier of fact, it was the jury's function to assess D.M.'s credibility and to "resolve conflicts or inconsistencies in the evidence." *People v. Evans*, 209 Ill. 2d 194, 211 (2004).

¶ 89        We reject defendant's claim that D.M.'s trial testimony was unworthy of belief because it was internally inconsistent. Specifically, defendant notes that D.M. was unsure how many times he had spoken to Jackson, thought he told Jackson that defendant assaulted him the first time he spoke with her, could not remember whether he told Jackson his "butt" bled because he fell off a skateboard, and said that he told Jackson he could not explain the term "rape." Defendant also

notes defense counsel easily led D.M. on cross-examination, and D.M. repeatedly gave inconsistent statements regarding whether he actually remembered defendant assaulting him.

¶ 90     The record shows that the inconsistencies noted by defendant consisted almost entirely of D.M.'s "yes" and "no" responses to questions posed by the prosecutor and defense counsel. D.M. was only 10 years old at the time of trial, and it was unclear how well he understood the questions posed by counsel. In response to many of the questions, D.M. said he did not know. On a few occasions, the prosecutor and defense counsel asked D.M. if he understood the question, and D.M. said no. D.M. seemed to feel overwhelmed by all the questions the attorneys asked, as he eventually started crying after the prosecutor and defense counsel repeatedly asked him similar questions. The jury observed D.M.'s testimony and was in the best position to assess his credibility. See *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). Given the circumstances of D.M.'s testimony, his consistent pretrial statements, and defendant's confession, the jury could have reasonably found D.M.'s trial testimony to be credible.

¶ 91     Additionally, we reject defendant's argument that he "did not unequivocally admit any wrongdoing to police." Although defendant denied assaulting D.M. during the first portion of the interview, he positively stated later in the interview that he assaulted D.M. Defendant gave a detailed account of the circumstances of the incident, explaining that after he put his penis in D.M.'s anus, he quickly "backed out" because he remembered being assaulted as a child. He said he asked himself, "What am I doing?" and told D.M. he was sorry. Defendant said he was shocked at what he had done. Defendant cried while he was telling the police about the assault and continued to cry after the interview was over. The jury could have interpreted this behavior to mean that telling the officers about the assault was cathartic for defendant, and defendant felt remorse.

¶ 92      Finally, we reject defendant's argument that the jury should have been suspicious of defendant's confession because he had a low IQ and was questioned persistently by detectives who were much more sophisticated than him. Defendant put this theory before the jury, and the jury rejected it. Defendant testified that his confession was untrue, and Dr. Simone testified regarding defendant's low IQ. During closing arguments, defense counsel argued extensively that defendant's low IQ rendered his confession unreliable.

¶ 93      Also, the jury rewatched the video of defendant's confession during deliberations after hearing defense counsel's closing argument and the testimony of the defense witnesses. This can be interpreted to show that the jury reconsidered defendant's confession in light of defendant's evidence and theory of the case but still found the confession to be compelling. We note that during the interrogation, defendant appeared to understand the detectives' questions. After defendant confessed, he told the officers that when he was abused as a child, he only got a restraining order against his abuser because he did not want the abuser to go to jail or not be able to attend school. The jury could have interpreted this as an attempt by defendant to suggest to the detectives what he thought should happen to him, indicating that defendant was sophisticated enough to understand what might happen to him in light of his confession.

¶ 94                                    B. Jury Deliberations

¶ 95      Defendant next argues that the court abused its discretion in allowing the jury to view the video recording of defendant's confession several times during deliberations while refusing the jury's request for transcripts. Defendant's argument appears to have two components. First, defendant contends that the court abused its discretion in allowing the jury to view the confession video at all on the basis that it unduly highlighted that single piece of evidence. Second, defendant

argues that the manner in which the jury viewed the video was improper. We address each argument in turn.

¶ 96                    1. Allowing the Jury to View the Confession Video

¶ 97        Initially, we find that defendant forfeited his claim that the court abused its discretion in allowing the jury to view the confession video during deliberations. "To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion." *People v. Thompson*, 238 Ill. 2d 598, 611 (2010). Defendant did not object to the jury's request to view the video. Rather, defendant merely expressed concern that the jury would be permitted to view the video multiple times if the court allowed the jury to view the video on a laptop in the jury room rather than in the courtroom in the presence of the parties. Additionally, defendant's motion for a new trial challenged only the manner in which the trial court permitted the jury to view the video, not the court's underlying decision to allow the jury to view the video.

¶ 98        Even if we were to excuse forfeiture of this issue, we find that the court did not abuse its discretion in allowing the jury to view the video. "In determining whether to grant or refuse a request by the jury to rehear a piece of evidence, the trial court must determine whether review of the evidence would be helpful or harmful to the jury's deliberations." *People v. Alvarado*, 2013 IL App (3d) 120467, ¶ 15; see also *People v. Flores*, 128 Ill. 2d 66, 93 (1989).

¶ 99        Here, viewing the confession video again was undoubtedly helpful to the jury's deliberations. Defendant's confession was a key piece of evidence. Additionally, after the prosecutor played the video during trial, defendant presented evidence tending to show that the confession was unreliable. Specifically, defendant testified that he only said that he assaulted D.M. because the detectives would not listen to him when he told them he did not assault D.M. Defendant explained that he just wanted to go home. Defendant also presented evidence of his low

IQ. Defense counsel argued during closing argument that the confession was unreliable. In light of the defense evidence and closing argument, it would have been helpful for the jury to view the confession again.

¶ 100    The cases cited by defendant in support of his contention that playing the confession video unduly highlighted that piece of evidence over other relevant evidence are readily distinguishable from the instant case. In *People v. DeRossett*, 237 Ill. App. 3d 315, 338 (1992), for example, the jury asked what a witness testified to on a certain point. *Id.* at 337. In response, the trial court sent the jury a portion of the transcript of that witness's testimony on redirect examination. *Id.* at 338. However, the witness had testified differently on direct examination. *Id.* The *DeRossett* court held that the trial court committed reversible error in responding to the jury's request in this way because the portion of the testimony sent to the jury erroneously suggested that the witness's testimony as to that point was not at issue. *Id.* Here, unlike in *DeRossett*, the jury did not ask a question about the substance of a witness's testimony. Rather, the jury merely requested materials—namely transcripts and the confession video. In providing the confession video and stating that the transcripts were unavailable, the trial court did not convey to the jury that any aspect of the case was not at issue, as in *DeRossett*.

¶ 101    Similarly, in *People v. Sampson*, 86 Ill. App. 3d 687, 692 (1980), the court held that the trial court erred in answering a question from the jury where the jury phrased its question to ask what happened. The *Sampson* court reasoned that in answering the jury's question, the trial court "resolved issues of fact for the jury, usurping its function" and "stamped the State's position with [its] approval." *Id.* at 691-92. Here, unlike in *Sampson*, the jury did not ask what happened. Rather, the jury requested to review certain materials. The trial court merely providing the jury with the

- 34 -

confession video after they requested it did not usurp the function of the jury or "stamp[ ] the State's position" with the court's approval. *Id.* at 692.

¶ 102     In *People v. Franklin*, 135 Ill. 2d 78, 104-05 (1990), the court upheld the trial court in denying the jury's request for transcripts where the jury asked to see certain portions of a witness's testimony. The trial court noted that it would have had to "excise portions of the testimony to accommodate the jury's request." *Id.* at 105. The trial court feared that this would confuse the jury and unduly highlight certain portions of the witness's testimony. *Id.* Here, unlike in *Franklin*, the jury requested the video in its entirety, not certain portions. Allowing the jury to watch the video did not require the trial court to excise or alter evidence.

¶ 103     We also find *People v. Ammons*, 251 Ill. App. 3d 345 (1993) to be inapposite. *Ammons* does not involve a jury's request for materials during deliberations but rather a prosecutor playing a defendant's tape-recorded statement during closing argument. *Id.* at 347. In finding that the prosecutor's conduct was improper, the court relied on the principle that it is improper for a party to read from a trial transcript during closing argument because it overemphasizes such testimony "during the trial's waning moments." *Id.* This principle has no application to the instant situation.

¶ 104     We also reject defendant's argument that the court's error in allowing the jury to view the video of defendant's confession was "exacerbated by the judge's refusal to provide the jury with the transcripts it requested which *** contained information indicating [defendant's] confession to police was not credible." We reassert that the situation is not like in *DeRossett* and *Sampson*, where the jury asked a question regarding the content of a witness's testimony, or *Franklin*, where the jury asked to see only part of a witness's testimony. Rather, the jury requested certain materials. It was not misleading for the court to provide the jury with only the video where the other requested materials were unavailable. See *People v. Creque*, 214 Ill. App. 3d 587, 596 (1991)

("[A]ppropriate reasons for denying such request [to review testimony] include difficulties in obtaining transcripts, availability of court reporters and concern about trial delay.").

¶ 105                    2. Manner in Which the Jury Viewed the Video

¶ 106        Defendant also contends that the manner in which the jury viewed the video—namely, on a laptop in the jury room where it could be rewound and replayed multiple times—was erroneous. "[T]he mode and manner in which a circuit court allows a jury to review a piece of evidence *** falls directly within the scope of the court's inherent authority to manage its courtroom." *People v. McKinley*, 2017 IL App (3d) 140752, ¶ 22. We review such a determination for abuse of discretion. *Id.*

¶ 107        Here, the court did not abuse its discretion in allowing the jury to view the confession video in the jury room rather than the courtroom. Permitting the jury to view the video in this manner allowed the jury to review the video without outside intrusions and helped ensure the privacy and secrecy of the jury's deliberations. See *id.* ¶ 17. ("One of the fundamental tenets our judicial system is grounded upon is the mandate that the deliberations of the jury shall remain private and secret." (Internal quotation marks omitted.) (quoting *United States v. Olano*, 507 U.S. 725, 737 (1993), quoting Fed. R. Crim. P. 23(b), Advisory Committee Notes (1983 Amendments)).

¶ 108        In coming to this conclusion, we reject defendant's contention that:

> "It is apparent that the judge's decision to provide the jury with a laptop in the jury room was based on a fundamental misapprehension of criminal procedure. That is, she believed playing the tape for the jury in the courtroom with the judge and attorneys present would somehow impinge on the privacy of the jury's deliberations."

Defendant then cited *People v. Johnson*, 2015 IL App (3d) 130610, ¶ 17, for the proposition that the presence of a third party during deliberations does not require reversal where it causes no harm.

¶ 109 Contrary to defendant's argument, our holding in *Johnson* rejects the proposition that playing a video in the courtroom in front of the judge and the parties does not impinge upon the privacy of jury deliberations. Rather, we held in *Johnson* that while such a practice *does* impinge on the privacy and secrecy of jury deliberations, reversal is not warranted unless the defendant can show he was prejudiced by the intrusion. *Id.* We held that the record in *Johnson* showed that the defendant was not prejudiced by the court's decision to play a video in the courtroom in the presence of the judge and the parties rather than in the jury room. *Id.* ¶ 20. In reaching that determination, we reasoned that "the record of the courtroom viewing displays no intent to influence the jury's decision," and "[t]he essence of the decision to allow the jury to view the video in the courtroom was based on the lack of video equipment readily available in the jury room." *Id.* Thus, our holding in *Johnson* in no way supports the contention that the trial court erred in the instant case by allowing the jury to view the confession video in the jury room on a laptop rather than in the courtroom. In fact, by emphasizing that the court's decision to show the video in the courtroom was based on the lack of video equipment available in the jury room, our opinion in *Johnson* suggests that allowing the jury to watch a video in the jury room is the preferable method of showing a video during jury deliberations. See *id.*

¶ 110                              C. Closing Arguments

¶ 111 Defendant contends that the State denied him a fair trial due to prosecutorial misconduct during closing arguments. Specifically, defendant argues that the prosecutor improperly vouched for the credibility of the State's witnesses, accused defense counsel of fabricating a defense, and

misstated important evidence. We find that the prosecutor's remarks during closing arguments did not result in reversible error.

¶ 112    "Prosecutors are afforded wide latitude in closing argument." *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000). Challenged comments made by a prosecutor in closing argument must be considered in the context of closing arguments as a whole. *Id.* "[A] prosecutor's comments in closing argument will result in reversible error only when they engender 'substantial prejudice' against the defendant to the extent that it is impossible to determine whether the verdict of the jury was caused by the comments or the evidence." *People v. Macri*, 185 Ill. 2d 1, 62 (1998).

¶ 113                              1. Vouching for State Witnesses

¶ 114    First, defendant argues that the prosecutor improperly vouched for the credibility of State witnesses. "A prosecutor may express an opinion based on the record and may draw reasonable inferences from the evidence presented; however, a prosecutor may not vouch for the credibility of a government witness or use the credibility of the State's Attorney's office to bolster a witness's testimony." *People v. Effinger*, 2016 IL App (3d) 140203, ¶ 24. A prosecutor vouching for the credibility of a witness poses the following dangers: (1) such vouching can convey to the jury that there is other evidence known to the prosecutor but not presented to the jury that supports the charges against the defendant, and (2) the opinion of the prosecutor as to the credibility of a witness may cause a juror to trust the State's judgment rather than his or her own assessment of the evidence. *People v. Williams*, 2015 IL App (1st) 122745, ¶ 13.

¶ 115    Here, defendant objects to the following statement during closing argument:

> "[D.M.] is telling the truth. The defendant put his penis in the anus
> of [D.M.] The State's witnesses testified truthfully. *** Credibility
> is truly not an issue in this case. [D.M., E.W., Miles, Christian,]

Detective Hunter, and Detective Miramontes have been consistent and truthful. Yolanda and the defendant have not."

¶ 116      The above statement, when read in context, expresses an opinion as to witness credibility based on the evidence. The prosecutor argued that the State witnesses were credible but did not personally vouch for their credibility or suggest that she knew additional facts relating to the witnesses' credibility that was not presented at trial. Prior to asserting that the State's witnesses testified truthfully, the prosecutor discussed the testimony of each witness and pointed out ways in which the State's witnesses testified consistently with one another. Defendant also discussed the discrepancies in the testimony of the defense witnesses before arguing that their testimony had not been consistent and truthful.

¶ 117      Defendant also contends that the following statement, made during the State's rebuttal argument, improperly vouched for D.M.'s credibility: "[D.M.] said the defendant did it. I know he did it. Nobody put it in his head. Don't believe that fairy tell [*sic*] *** [H]e knows that it happened at Yolanda's house. *** He knows that it happened in her living room ***." This statement, like the first statement, expresses an opinion based on the evidence rather than improperly vouching for D.M.'s credibility. Immediately prior to saying, "I know he did it[,]" the prosecutor stated, "[D.M.] doesn't know what the outcome is going to be, but he told you he knows—he said the defendant did it. I know he did it." Thus, when read in context, the prosecutor's statement "I know he did it" referred to what D.M. knew, not to what the prosecutor knew. Stated another way, the prosecutor was expressing that D.M. knew defendant "did it"; the prosecutor was not saying that she personally knew defendant "did it."

¶ 118              2. Accusing Defense Counsel of Fabricating a Defense

¶ 119        We next address defendant's argument that the prosecutor improperly attacked defense counsel during the State's rebuttal argument.

¶ 120        "The State may challenge a defendant's credibility and the credibility of his theory of defense in closing argument when there is evidence to support such a challenge." *Kirchner*, 194 Ill. 2d at 549. "It is well established, however, that ' "*[u]nless based on some evidence,* statements made in closing arguments by the prosecution which suggest that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury are improper." ' " (Emphasis in original.) *Id.* (quoting *People v. Jackson*, 182 Ill. 2d 30, 81 (1998), quoting *People v. Emerson*, 97 Ill. 2d 487, 497 (1983)). "While the prosecution may not accuse defense counsel of attempting to create reasonable doubt by confusion, misrepresentation, or deception [citation], the prosecution may fairly comment on defense counsel's characterizations of the evidence and may respond in rebuttal to statements of defense counsel that noticeably invite a response [citation]." *People v. Willis*, 2013 IL App (1st) 110233, ¶ 110.

¶ 121        Here, defendant takes issue with the following statements made in the prosecutor's rebuttal argument:

> "So everyone that the State has put on in this trial is tricky, deceiving. They all have a big plan. They're all out to get the poor defendant. Everybody on the defendant's side is dumb. They've been taken advantage of. They're all telling the truth. That's what [defense counsel] wants you to believe. She has completely dumbed down her side of the case. You know, the State's picking on the defendant. The police are picking on the defendant. [Miles] is picking on the defendant. [D.M.] and [E.W.] are picking on the

defendant. Wow. I don't want to offend you when I say this, but you know in listening to what she was saying I was flabbergasted. I—we were not in the same trial. We did not hear the same evidence ***. Yeah, that's her story. That's what she wants you to believe. That story has not been borne out by any of the evidence. That's a story she is just making up to make her side look dumb and taken advantage of."

¶ 122    Upon examination, the above statements did not attack defense counsel personally but rather attacked defendant's theory of the case and characterizations of the evidence set forth during defense counsel's closing argument.

¶ 123    Defendant also claims that the following statement was a "ludicrous distortion" of defense counsel's argument and improperly shifted the burden to defendant to prove that he was not guilty:

"The defendant's whole case depends on whether one officer went to the defendant's house or whether the two officers went to defendant's home. That's all they have at this point, ladies and gentlemen. That is all they have to try and convince you that this defendant Thomas Watson is not guilty. *** That's the crux of their argument."

¶ 124    While the prosecutor's statement that "defendant's whole case depend[ed] on whether one officer" or two went to defendant's home was not literally accurate, the prosecutor was attempting to make the point that defense counsel's closing argument focused on small, arguably minor discrepancies in the witnesses' testimony in an attempt to discredit the State's witnesses. Also, after making the above remarks, the prosecutor went on to respond to additional issues raised by

defense counsel during closing argument, including the voluntariness of defendant's confession and the credibility of D.M. This indicated that the State recognized that the number of officers was not the only point argued by defendant.

¶ 125    Additionally, the following statements were omitted after the third sentence of the above excerpt:

> "Why do they keep making a big deal out of the officers? One versus two. The reason is that the defense wants you to believe that if one officer went over there—you know, and again this doesn't—this doesn't make sense again because so little Officer Miramontes going by himself, the inexperienced officer, that's okay, but no if you have two officers, big Detective Hunter with all the experience—if two go then all of a sudden that's different. That's the crux of their argument."

Thus, when the excerpt is read in its entirety with no text omitted between the third and fourth sentences, it shows that the prosecutor was not stating that the crux of defense counsel's entire closing argument was whether one officer or two went to defendant's house. Rather, the prosecutor was saying that the crux of defendant's argument concerning the number of officers at the house was that two officers coming to the house was unduly intimidating.[2]

¶ 126    Defendant's argument that the statement "[t]hat is all they have to try and convince you that this defendant *** is not guilty" improperly shifted the burden to defendant to prove his innocence also fails. Defendant relies on *People v. Weinstein*, 35 Ill. 2d 467, 469-71 (1966), in

---

[2]The State's explanation for why defendant believed the number of officers who went to his home was significant appears to be inaccurate in light of the fact that defendant and Tamesha testified that one officer came to the house, while Miramontes testified that both he and Hunter went to the house.

support of his argument. In *Weinstein*, the prosecutor repeatedly stated during closing argument that the defendant had the burden to present evidence creating a reasonable doubt of her guilt. *Id.* at 469. The court found that these statements constituted reversible error because they "destroyed the presumption of innocence" and "imposed upon defendant a heavier burden than the law required while lessening that of the prosecution." *Id.* at 470. Here, unlike in *Weinstein*, the State did not say defendant had the burden to present evidence creating a reasonable doubt of his guilt. Rather, the prosecutor's statement conveyed that defense counsel's closing argument relied on seemingly minor inconsistencies in the testimony.

¶ 127 Defendant also argues that the prosecutor's repeated comments that defense counsel was trying to "sell" them a "fairy tale" were personal attacks on defense counsel. When read in context, however, the prosecutor's "fairy tale" remarks expressed the prosecutor's opinion that the evidence did not support defendant's version of events, particularly his claim that the detectives coerced his confession.

¶ 128 Further, in *People v. Robinson*, 391 Ill. App. 3d 822, 840 (2009), the court held that similar remarks were permissible. The *Robinson* prosecutor remarked during his rebuttal argument that "the defense's highlighting the lack of DNA and fingerprint evidence was 'tak[ing] you 12 people and send[ing] you off to some kind of fairy tale land and think about all these things that don't make any difference.' " *Id.* The *Robinson* court held that it was not improper for the prosecutor to refer to "the defendant's argument about the lack of DNA and fingerprint evidence as akin to a 'fairy tale.' " *Id.* at 841. The court reasoned that this was "an acceptable comment on the persuasiveness of the defense theory." *Id.* The *Robinson* court noted that "the State properly confined itself to commenting on the defense theory rather than on defense counsel personally."

*Id.* In the instant case, like in *Robinson*, the "fairy tale" remarks referred to defendant's theory of the case and were not personal attacks on defense counsel.

¶ 129                                   3. Misstating Evidence/Improper Rehabilitation

¶ 130          Defendant also argues that the prosecutor misstated evidence and improperly rehabilitated D.M. in her rebuttal argument when she made the following statement:

> "So think back to [D.M.'s] second interview of June 21st of 2011. So what is different now from that second interview back to the first interview? *** He hasn't been sent away after that first interview. He now knows how the interview will go because this is the second one, so he knows the format. He knows [Jackson]. And [Jackson], she's the least intimidating person that showed up here. And he probably realizes now that his brothers told what they know about what the defendant did to him. And he also knows one other thing. He knows that the defendant is in jail ***. So while he still does not want to tell, doesn't seem likely [*sic*] that he now feels more secure in telling? He hasn't been sent away. The defendant is in jail. And Ms. Jackson is not out there to get disclosures like [defense counsel] would like to you [*sic*] believe. She's done over 600 interviews. She doesn't work for the police."

Specifically, defendant contends that the above comments misstated the evidence because: (1) D.M. never said he made inconsistent statements to Jackson for the reasons given by the prosecutor, (2) the prosecutor highlighted the fact that defendant was in jail at the time of trial, (3) Jackson actually worked *with* the police, and (4) the prosecutor "argu[ed] the case as if the

second CAC interview tape contained only accusations by D.M. and no denials." We address each argument in turn.

¶ 131    First, we reject defendant's argument that the prosecutor's statements were not based on the evidence and violated the advocate-witness rule. While D.M. did not say that he made inconsistent statements for the reasons stated by the prosecutor, the prosecutor's explanations for D.M.'s inconsistent statements were all reasonable inferences based on the trial evidence. See *People v. Glasper*, 234 Ill. 2d 173, 204 (2009) ("A prosecutor has wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences it yields."). E.W. testified that he and his brothers were taken to DCFS approximately one week after he and D.M. told Yolanda that defendant assaulted D.M. The video of D.M.'s interviews at the CAC show that the second interview followed the same format as the first, and Jackson conducted both interviews. D.M. stated during his second interview that he knew defendant was in jail. The videos of E.W.'s and E.G.'s interviews with Jackson show that they each told Jackson that defendant assaulted D.M. Additionally, the prosecutor's statements did not violate the advocate witness rule. "[T]he 'advocate-witness rule' *** bars attorneys from assuming a dual role as advocate and witness in the same proceedings." *People v. Blue*, 189 Ill. 2d 99, 136 (2000). Because the prosecutor's statements were based on the evidence, the prosecutor did not improperly testify in violation of the advocate-witness rule.

¶ 132    Second, we reject defendant's argument that it was improper for "the prosecutor [to] twice highlight[ ] the fact that [defendant] was in jail at the time of trial." In support of his argument, defendant cites *People v. Hayes*, 353 Ill. App. 3d 578, 586 (2004), in which we "caution[ed] prosecutors to refrain from making comments such as, 'Sent the defendant back to jail.' " We reasoned that "[r]eferences to a defendant's residency at the county jail improperly imply that the

- 45 -

defendant is a bad man deserving of punishment ***." *Id.* Here, the prosecutor did not ask the jury to send defendant back to jail as in *Hayes* or draw attention to the fact that defendant was currently in jail. Rather, the prosecutor argued that D.M. may have felt more comfortable discussing the assault during his second interview at the CAC because he knew defendant was in jail at that time. This argument was not improper, as D.M. told Jackson during the second interview that he knew defendant was in jail.

¶ 133      Third, we reject defendant's argument that the prosecutor somehow misstated the evidence in saying that Jackson did not actually work for the police. The prosecutor's statement was accurate; Jackson testified that she did not work for the police but for an organization called Child Network, which conducted forensic interviews at the request of law enforcement or DCFS. The State's distinction that Jackson did not work for the police was not improper, especially in light of the fact that defense counsel compared D.M.'s CAC interview to a coercive interrogation.

¶ 134      Finally, we reject defendant's argument that the prosecutor "misstated the evidence by arguing the case as if the second CAC interview tape contained only accusations by D.M. and no denials."[3] The prosecutor never said that the second video contained "no denials." The prosecutor did not somehow misstate the evidence by focusing on D.M.'s eventual disclosure and not saying that he first denied being assaulted. Further, the prosecutor acknowledged that at the second interview, D.M. "still [did] not want to tell." This statement can be construed as acknowledging that D.M. did not disclose immediately during the second interview.

¶ 135                        4. Cumulative Error

---

[3]In defendant's brief, he states: "Jackson misstated the evidence by arguing the case as if the second CAC interview tape contained only accusations by D.M. and no denials." Based on the context of this statement, we assume that defendant intended to say that the prosecutor, rather than Jackson, misstated the evidence.

¶ 136    As the above comments were not improper, the cumulative effect of the alleged improper statements did not prejudice defendant.[4]

¶ 137                    D. As-Applied Constitutional Challenge Under the Eighth Amendment and
                                    Proportionate Penalties Clause

¶ 138    Defendant argues that the following statutes are unconstitutional as applied to him: (1) the SORA (730 ILCS 150/1 *et seq.* (West 2016)), (2) the Sex Offender Community Notification Law (730 ILCS 152/101 *et seq.* (West 2016)), (3) section 11-9.3 of the Criminal Code of 2012 (Code) (720 ILCS 5/11-9.3 (West 2016)) (prohibiting presence in school zones), (4) section 11-9.4-1 of the Code (*id.* § 11-9.4-1) (prohibiting presence in or near public parks), (5) section 5-5-3(o) of the Unified Code of Corrections (730 ILCS 5/5-5-3(o) (West 2016)) (requiring annual renewal of driver's license), and (6) section 21-101 of the Code of Civil Procedure (735 ILCS 5/21-101 (West 2016)) (prohibiting petition for name change) (collectively, the sex offender laws). Defendant contends that the sex offender laws constitute punishment that is constitutionally disproportionate to his offense in violation of the eighth amendment of the United States Constitution (U.S. Const., amends. VIII, XIV) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 139    In our initial order, we found that the record was not sufficiently developed to determine whether the sex offender laws were unconstitutional as applied to defendant. However, the supreme court has directed us to consider the effect of its recent decision in *Bingham*, 2018 IL 122008, on the issue of whether a defendant may raise the constitutionality of the SORA on direct appeal. We ordered the parties to submit supplemental briefing on this issue. Pursuant to the

---

[4]I acknowledge that Justice McDade's special concurrence found some of the comments related to the prosecutor allegedly vouching for the credibility of the State's witnesses to be improper. However, she found that these comments did not result in reversible error.

holding in *Bingham*, this court lacks jurisdiction to consider the constitutionality of the SORA and related sex offender laws as applied to defendant on direct appeal of his conviction.

¶ 140    In *Bingham*, the defendant was convicted of felony theft. *Id.* ¶¶ 8-9. The defendant's conviction for felony theft triggered the requirement that he register as a sex offender based on his 1983 conviction for attempted criminal sexual assault. *Id.* ¶ 10. On direct appeal of his conviction for felony theft, the defendant argued that the registration requirement of the SORA was unconstitutional as applied to him on substantive due process grounds and that it violated *ex post facto* principles. *Id.* ¶ 14.

¶ 141    The supreme court dismissed the appeal. *Id.* ¶ 25. The court held that a reviewing court had no power on direct appeal of a criminal conviction to order that the defendant be relieved of the obligation to register as a sex offender "when there is neither an obligation to register imposed by the trial court nor an order or conviction that the defendant [was] appealing that [was] directly related to the obligation or the failure to register." *Id.* ¶ 18. The court further reasoned:

> "A contrary rule would permit appeal of collateral issues on direct appeal from a criminal conviction not only to sex offender obligations but to a host of other collateral consequences of convictions that are not imposed by trial courts and are not embodied in their judgments. Such consequences would likely include 'the loss of the right to vote, disqualification from public benefits, ineligibility to possess firearms, dishonorable discharge from the Armed Forces, and loss of business or professional licenses.' Allowing defendants to challenge the collateral consequences of a conviction on direct appeal would place a reviewing court in the

position of ruling on the validity (or resolving the details) of regulatory programs administered by state agencies and officials that are not parties to the action." *Id.* ¶ 19 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 376 (2010) (Alito, J., concurring in the judgment, joined by Roberts, C.J.)).

The *Bingham* court stated that as-applied constitutional challenges to the SORA could properly be raised through either a direct appeal from a case finding a defendant guilty of violating the regulation he or she attempts to challenge as unconstitutional or by filing a civil suit seeking a declaration of unconstitutionality and relief from the classifications and burdens of sex offender registration. *Id.* ¶ 21.

¶ 142    Pursuant to the reasoning in *Bingham*, this court lacks jurisdiction to review defendant's as-applied challenge to the constitutionality of the sex offender laws in this appeal because the restrictions imposed by the sex offender statutory scheme are collateral consequences of his conviction for aggravated criminal sexual assault. See *id.* ¶ 19.

¶ 143    Defendant argues that the holding in *Bingham* does not apply because he is appealing a conviction that is directly related to his obligation to register as a sex offender, whereas the *Bingham* defendant's theft conviction was not directly related to his obligation to register. This argument is unpersuasive. Admittedly, the *Bingham* court considered the lack of nexus between the offense being appealed and the obligation to register as a sex offender in its analysis. See *id.* ¶ 18 ("[A] reviewing court has no power on direct appeal of a criminal conviction to order that defendant be relieved of the obligation to register as a sex offender when there is neither an obligation to register imposed by the trial court *nor an order or conviction that the defendant is appealing that is directly related to the obligation or the failure to register*." (Emphasis added.)).

However, the reasoning in *Bingham* broadly prohibits as-applied constitutional challenges to collateral consequences of criminal convictions on direct review. See *id.* ¶¶ 18-19. The *Bingham* court noted two proper ways that as-applied constitutional challenges to the SORA could be raised (*id.* ¶ 21), neither of which was through direct appeal of a conviction directly related to the requirement to register. Accordingly, the holding in *Bingham* extends to the situation presented in the instant case—namely, a defendant attempting to challenge collateral consequences of a conviction for a sex offense on direct appeal of that conviction.

¶ 144                                III. CONCLUSION

¶ 145        For the foregoing reasons, this court lacks jurisdiction to address defendant's as-applied constitutional challenge to the sex offender laws, and that portion of the appeal is dismissed. With regard to the other issues raised on appeal, we affirm the judgment of the circuit court of Kankakee County.

¶ 146        Affirmed in part; dismissed in part.

¶ 147        JUSTICE McDADE, specially concurring:

¶ 148        I concur in the judgment. I write separately to express my disagreement with the author's reasoning as to the third and fourth issues. I address each of these issues in turn.

¶ 149                          A. Prosecutor's Closing Argument

¶ 150        I believe that the prosecutor's statements that "[D.M.] is telling the truth," "[t]he State's witnesses testified truthfully," and "[c]redibility is truly not an issue in this case" improperly vouched for the credibility of the State's witnesses. Another instance of improper vouching occurred when the prosecutor stated: "[D.M.] said the defendant did it. I know he did it. Nobody put it in his head."

¶ 151    I note our holding in *Effinger*, 2016 IL App (3d) 140203, ¶ 26, in which we found that the prosecutor's statements during closing argument improperly vouched for the credibility of a witness for the State. Specifically, we reasoned:

> "In the present case, we find that the State impermissibly vouched for the victim's credibility when it argued that the victim 'was credible and you should believe her' and 'we believe [the victim is] credible.' The State further erred when it said in its rebuttal argument that 'we believe [the victim is] credible, that she told— everything she said was completely credible and makes perfect sense as to how everything happened.' " *Id.* ¶ 25.

The prosecutor's statements in the instant case were substantially similar to the ones in *Effinger*. Thus, as in *Effinger*, I would find that the prosecutor improperly vouched for the credibility of the State's witnesses.

¶ 152    However, though I believe the prosecutor's statements were improper, I do not believe the remarks constituted reversible error in this case. Defendant's objection to these remarks was forfeited, so the issue is subject to plain-error analysis. *People v. Herron*, 215 Ill. 2d 167, 178 (2005). The plain-error doctrine allows a reviewing court to reach a forfeited error where: (1) "the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence," or (2) "the error is so serious that the defendant was denied a substantial right, and thus a fair trial." *Id.* at 178-79.

¶ 153    In light of what I perceive to be defendant's uncoerced confession to the offense, I do not believe that the evidence was closely balanced such that the first prong of plain error applies.

¶ 154    Additionally, I do not believe that the cumulative effect of the improper statements was to call into question the fairness of the trial and integrity of the judicial process such that the second

prong of plain-error analysis applies. Even if remarks made during closing argument are improper, reversal is not required unless the error results in " 'substantial prejudice such that the result would have been different absent the complained-of remark.' " *People v. Williams*, 192 Ill. 2d 548, 573 (2000) (quoting *People v. Cloutier*, 156 Ill. 2d 483, 507 (1993)). See also *Wheeler*, 226 Ill. 2d at 123 ("Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in a defendant's conviction."). In this case, where defendant confessed to the offense, I do not believe that the result of the trial would have been different absent the prosecutor's improper statements.

¶ 155    That said, a prosecutor creates a substantial risk of injustice whenever he or she puts the very weighty thumb of the State on the scale to cloak its own witnesses with truth and unfairly shifts the credibility balance in the case. Such bolstering is wrong and it needs to be identified as misconduct even in a case such as this where it is not determinative of the outcome.

¶ 156                              B. As-Applied Constitutional Challenge

¶ 157    While I agree with the author that we lack jurisdiction to consider defendant's as-applied constitutional challenge, I disagree with the author's interpretation of the holding in *Bingham*. *Supra* ¶ 142. Specifically, the author finds that the restrictions imposed pursuant to the sex offender laws are collateral consequences of defendant's conviction and that "*Bingham* broadly prohibits as-applied constitutional challenges to collateral consequences of criminal convictions on direct review." *Supra* ¶ 143. As I discussed in my partial dissent in *People v. Kochevar*, 2020 IL App (3d) 140660-B, ¶ 41, I do not believe that *Bingham* mandates dismissal of as-applied constitutional challenges to the SORA in every direct appeal of a criminal conviction.

¶ 158    Rather, *Bingham* contemplates review of as-applied challenges to the SORA on a case-by-case basis with four conceptual components guiding the analysis. *Id.* These components include

whether (1) the sex offender registration was related to the defendant's conviction and sentence in the circuit court, (2) the obligation to register was imposed by the circuit court, (3) the obligation to register constituted punishment, and (4) the record contained sufficient factual findings to consider the issue. *Id.* ¶ 43. In *Kochevar*, I concluded that the defendant satisfied all four prongs of this analysis. *Id.* ¶¶ 41-48.

¶ 159 In the instant case, like in *Kochevar*, the first prong of the analysis is satisfied. Defendant's obligation to register was directly related to his conviction for aggravated criminal sexual assault in this case. See 730 ILCS 150/2(A)(1)(a), (B)(1) (West 2008). Also, pursuant to my analysis in *Kochevar*, I believe that the restrictions imposed by the SORA and related statutes are punitive such that the third prong was satisfied. *Kochevar*, 2020 IL App (3d) 140660-B, ¶¶ 68-93.

¶ 160 Whether the second prong of the analysis was satisfied in this case presents a close question. The court's written order does not include the obligation to register as a sex offender, but the court mentioned the obligation to register twice during the sentencing hearing. First, after admonishing defendant of the possible sentencing range and term of mandatory supervised release (MSR), the court noted that defendant would be required to register as a sex offender for life. Also, at the end of the hearing, the court noted that it was not going to be easy for defendant when he was released from prison because he would have to register as a sex offender and be on MSR. While the court discussed the obligation to register during the sentencing hearing, it is unclear whether the court *ordered* defendant to register. Accordingly, this case is factually distinguishable from *Kochevar*, where the obligation to register was stated explicitly in the written probation order (*id.* ¶ 45) and *People v. Rodriguez*, 2019 IL App (1st) 151938-B, ¶ 10, where the circuit court orally ordered the defendant to register as a sex offender within three days.

¶ 161    Even if the court's statements at the sentencing hearing could be construed as ordering defendant to register, I would find that we lack jurisdiction to consider defendant's as-applied challenge because the fourth conceptual component is not satisfied in this case. That is, the record does not contain sufficient factual development to address defendant's as-applied challenge. In arguing that the SORA and related laws are unconstitutional as applied to him, defendant contends that he is unlikely to reoffend based on his minimum sentence, his lack of a criminal record, his age at the time of the offense, the fact that he only committed a single act of sexual assault, and the fact that "[h]e was not shown to be at risk to re-offend." However, many of these factors are ambiguous, and nothing in the record affirmatively shows that defendant is unlikely to reoffend. Significantly, the record does not contain any sex offender evaluations or other psychological evaluations assessing defendant's risk to sexually reoffend.

¶ 162    Because at least one of the four conceptual components set forth in *Bingham* was not satisfied, I agree with the author that we lack jurisdiction to consider defendant's as-applied challenge to the SORA and related laws.

¶ 163    JUSTICE WRIGHT, dissenting:

¶ 164    I agree with Justice McDade's determination that the prosecutor improperly vouched for the credibility of the State's witnesses during closing argument. However, I respectfully disagree that defendant's uncoerced confession provided overwhelming evidence of guilt that defeats plain error and supports defendant's conviction. In fact, I have serious doubts about the sufficiency of the State's evidence.

¶ 165    Even an uncoerced confession may contain falsehoods. To reduce the possibility that a conviction could result from a false confession, the case law requires that an extrajudicial confession, such as the confession in the case at bar, must be independently corroborated by some

other piece of evidence. Such independent evidence does not exist in this record. An uncorroborated incriminating admission, standing alone, does not satisfy the State's burden of proof beyond a reasonable doubt. *People v. Sargent*, 239 Ill. 2d 166, 183 (2010).

¶ 166     In this case, the State did not present any medical evidence proving D.M. had been anally penetrated by a penis at some point in time. Further, the State did not present any evidence establishing either the existence of blood on the couch or linking the purported blood to D.M. Clearly, the State's case hinged entirely on D.M. providing some testimonial corroboration of defendant's pretrial confession. Yet, both defendant and D.M. provided conflicting pretrial statements that impeached their own trial testimony.

¶ 167     Turning to D.M.'s two pretrial statements, both statements could not be true. D.M.'s first pretrial statement strongly supported the defense theory that defendant had given the police a false confession. D.M.'s second pretrial statement directly contradicted D.M.'s first statement and raised serious concerns about the reliability of either version of the events. Further, D.M.'s 2014 trial testimony did not corroborate any portion of defendant's confession because D.M. admitted he did not have an independent recollection of the incident. In fact, during cross-examination, D.M. candidly admitted that the source of information for his detailed trial testimony was his older brother's recollection of the events. A complaining witness without prior recollection adds nothing to the State's case. Therefore, the bottom line remains – a fair interpretation of the State's evidence causes me to conclude this record does not contain any reliable corroboration of defendant's incriminating admission to having "sex" on the "couch." For this reason, I conclude the State's evidence was insufficient and the conviction should be reversed.

¶ 168    Even assuming, for the sake of argument, that the State's evidence when viewed in the light most favorable to the State was sufficient, the prosecutor's closing argument requires reversal. The following exchange demonstrates the difficulty with the State's complaining witness:

"Q.    And [E.W.] he tells you what he believes happened, right?

A.    Yes.

Q.    And he's told you that over and over?

A.    Yes.

Q.    And he's told you different situations of this story?

A.    Yes.

Q.    So do you have any actual memory of this?

A.    No.

Q.    So all you're telling us today is what [E.W.] told you?

A.    Yes."

¶ 169    In spite of this significant credibility concern due to D.M.'s self-admitted absence of recollection, the prosecutor boldly and improperly emphasized:

"[D.M.] is telling the truth. The defendant put his penis in the anus of [D.M.]

The State's witnesses testified truthfully. *** Credibility is truly not an issue in this

case."

Here, it was the jury's duty to decide the credibility of D.M.'s prior forensic interviews and trial testimony. In this case, the prosecutor improperly announced this credibility determination for the jury.

¶ 170    For the reasons set forth above, I conclude the State's evidence was insufficient and the record contains prosecutorial misconduct. On either basis, I conclude defendant's conviction

should be reversed. Therefore, I express no opinion with respect to the proper interpretation of

*Bingham* as discussed by my respected colleagues.